United States District Court
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| TXI OPERATIONS, LP, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  4:20-cv-353 |
| | § | Judge Mazzant |
| CITY OF McKINNEY, TEXAS, | § | |
| Defendant. | § | |
| | § | |

_____

CONSOLIDATED WITH

| | | |
|---|---|---|
| TXI OPERATIONS, LP, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No.  4:20-cv-609 |
| CITY OF McKINNEY, TEXAS and the | § | Judge Mazzant |
| BOARD OF ADJUSTMENTS FOR THE | § | |
| CITY OF McKINNEY, TEXAS, | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are Plaintiff's Motion for Partial Summary Judgment (Dkt. #59), City Defendants' Amended Motion for Summary Judgment (Dkt. #65), City Defendants' Objections to Plaintiff's Summary Judgment Evidence and Motion to Strike (Dkt. #74), and Plaintiff's Resubmission of its Objections to Defendants' Summary Judgment Evidence and Motion to Strike (Dkt. #88).

Having considered the motions and the relevant pleadings, the Court finds that Plaintiff's Motion for Partial Summary Judgment (Dkt. #59) should be **DENIED**, City Defendant's Amended Motion for Summary Judgment (Dkt. #65) should be **GRANTED in part** and **DENIED in part**, Plaintiff's Resubmission of its Objections to Defendants' Summary Judgment Evidence and Motion to Strike (Dkt. #88) should be **DENIED**, and City Defendants' Objections

to Plaintiff's Summary Judgment Evidence and Motion to Strike (Dkt. #74) should be **GRANTED in part** and **DENIED in part**.

## BACKGROUND

The parties to this suit have a long history which has culminated in the current lawsuit. TXI Operations, LP ("TXI") is suing the City of McKinney and the Board of Adjustments for the City of McKinney ("Board") (collectively, the "City") for breach of contract and a plethora of violations of TXI's state and constitutional rights relating to property it owns within the City of McKinney.  According to TXI, the City improperly used its municipal powers to deprive TXI of the lawful use of its property, a use it was entitled to by contract.  The City, on the other hand, contends that it was merely using its governmental authority to bring TXI's property into conformity with its new comprehensive zoning plan.  The City contends that the new plan was necessary because of the growth the City is experiencing.

### I.      The Prior Litigation and Settlement Agreement

The conflict between these parties began over two decades ago and stems from a previous lawsuit involving the City of McKinney, J.R. Marriott, B.O. Marriott, Marriott Brothers, Inc. (collectively, the "Marriott Brothers"), TXI, Chemical Lime, Ltd. ("Chemical Lime"), and Martin Marietta Materials Southwest, Ltd. ("Martin Marietta").[1]  The Marriott Brothers, TXI's predecessors-in-interest, owned and leased out property in the City of McKinney.  The various businesses on the property were operating under a temporary certificate of occupancy, which later expired.  Upon expiration of the certificate of occupancy, the property was not issued a new certificate because the City Council of McKinney ("City Council") did not approve a new site

---

[1] The Marriott Brothers owned the property at issue in the prior lawsuit—located at 2105 South McDonald Street, McKinney, Texas (Dkt. #59-10, Exhibit 2 at p. 2).  TXI, Martin Marietta, and Chemical Lime were lessees or sublessees of different portions of the Marriott Brothers' property (Dkt. #59-10, Exhibit 2 at p. 2).  Now, TXI owns the portion of the property that it was leasing.  TXI's property is located at 2005 South McDonald Street, McKinney, Texas.

plan.  Nonetheless, the entities on the Marriot Brothers' property continued to operate.  However, without the new certificate, the City of McKinney claimed that the Marriott Brothers' property was in violation of city ordinances.  According to the City of McKinney, although the property would not be in violation of the proposed, but rejected, site plan, the property was being run in a manner inconsistent with the prior site plan.  In other words, the businesses were operating the property in a manner that would have been lawful if the City Council had not rejected the proposed site plan.  Thus, litigation between the parties ensued.

The Marriott Brothers and the City of McKinney resolved the conflict when they entered into a settlement agreement ("Settlement Agreement") in 2001 (Dkt. #59-10, Exhibit 2 at pp. 2–10).[2]  In the Settlement Agreement, the parties agreed that each party to the conflict would dismiss with prejudice all citations and lawsuits.  For the citations and lawsuits to be dismissed though, the Marriot Brothers were required to submit and comply with an approved site plan and the City, upon completion of the improvements in the approved site plan, was required to issue a permanent certificate of occupancy to the Marriott Brothers' property.  TXI, for its role in the Settlement Agreement, agreed to reasonably accommodate the Marriott Brothers' efforts to comply with the approved site plan.  The Settlement Agreement was synthesized in an Agreed Judgment ("Agreed Judgment").  After entry of the Agreed Judgment, TXI completed the improvements required under the approved site plan and the City issued a permanent certificate of occupancy.  To receive the permanent certificate of occupancy, the Marriott Brothers had to comply with the terms of the Settlement Agreement and Agreed Judgment.  As mentioned, the Marriott Brothers are TXI's predecessors-in-interest to the property at issue in the current suit.

---

[2] TXI, along with Chemical Lime and Martin Marietta, was a party to the Settlement Agreement and is bound by the terms of the Settlement Agreement (Dkt. #59-10, Exhibit 2 at pp. 2–10).

## II.      The Change in Zoning and Use of TXI's Property

When TXI began operating its concrete batch plant, the area was zoned as a Light Manufacturing District in the front portion of the property and a Heavy Manufacturing District on the remainder of the property.  The actual concrete batch plant is located on the area of the property that was zoned as a Heavy Manufacturing District.  Operating a concrete batch plant is a legal use of property in a Heavy Manufacturing District.  TXI legally operated the plant on its property pursuant to the Settlement Agreement until early 2019, when rezoning of the property was approved by the City of McKinney's Planning and Zoning Commission ("Commission") and the City Council.  The City contends that the rezoning was necessary; otherwise, the property would never come into conformity with the ONE McKinney 2040 Plan ("Comprehensive Plan") that the City adopted in 2018 (Dkt. 66-1, Exhibit 2).

### A.  The Comprehensive Plan

In 2015, the City of McKinney began the process of updating its Comprehensive Plan. On October 2, 2018, the City Council adopted the Comprehensive Plan.  The Comprehensive Plan's Vision Statement calls for "[s]mart public & private investments [to] ensure that McKinney remains a top choice for people to live, work, play & visit through 2040 & beyond" (Dkt. #66-1, Exhibit 2 at p. 3).  According to the City, the Comprehensive Plan is meant to support the City's economy and people.

As part of the Comprehensive Plan, the City wanted to revamp what it labels the "Southgate District" of McKinney.  The Southgate District is the area located around the intersection of State Highway 5 and State Highway 121.  The changes to the Southgate District include a new professional campus—which the City hopes will attract new corporations and better take advantage of the surrounding amenities.  According to the Comprehensive Plan, the

4

City expects that the professional campus will be located on the land currently occupied by TXI's concrete batch plant.

### B.  The City Rezones TXI's Property

In line with the Comprehensive Plan, the City submitted a proposal to the Commission requesting that the Commission approve the rezoning of TXI's property, as well as two adjacent properties owned by CowTown Redi-Mix, Inc. ("CowTown") and Lhoist North American of Texas ("Lhoist"), from a combined Light Manufacturing District and Heavy Manufacturing District to a Regional Office District in its entirety.  On March 26, 2019, the Commission unanimously approved the rezoning of TXI's property.  A few weeks later, on April 16, 2019, the City Council also approved the City's rezoning request.

Texas law and the City's own ordinances require that property owners receive notice before their property may be rezoned.  The City claims that it gave proper notice to TXI. Meanwhile, TXI claims that it never received notice from the City before the City voted to rezone TXI's property.

### C.  The City Amortizes TXI's Property

On November 5, 2019, the City Council enacted an ordinance that established the authority of the Board to amortize property.  Under the amortization ordinance, upon the request of a majority of the City Council, the Board is allowed to set a date for mandatory compliance of any nonconforming land use.  On December 3, 2019, the City Council voted to request that the Board consider the amortization of TXI's property.  The Board originally scheduled a hearing on amortizing the property on either February 11, 2020, or February 12, 2020, it is unclear; however, the hearing was actually held on February 26, 2020.  According to the City, it provided public notice through the newspaper of both hearing dates.  TXI disputes that any notice was

ever posted.  Regardless, at the February 26, 2020 hearing, the Board voted to initiate an amortization of TXI's property, as it was not in compliance with a Regional Office District type of zoning.

The City then hired Scott Hakala to perform a business valuation on TXI and conduct an amortization analysis to aid the City in determining the remaining life of TXI's concrete batch plant.  According to the City, it issued a subpoena duces tecum to TXI, requesting that TXI produce records to assist with determining the amortization period and establish a compliance date.  In addition, the subpoena informed TXI of a July 29, 2020 hearing to consider, discuss, and act on determining an amortization period and establish a compliance date.  However, TXI did not respond to the subpoena.  Accordingly, TXI did not produce any records and the amortization report was created without TXI's records.

TXI attended the hearing, but TXI's ability to participate in the hearing was limited. According to the City, the City did not allow TXI to make certain challenges at the meeting because it waived those challenges when it failed to respond to the subpoena.  Instead, TXI was given three minutes to speak, the time provided to all members of the public who attended the hearing.  During the hearing, the Board heard from the City's Chief Building Official and Scott Hakala.  The Board also received and reviewed multiple reports.  However, TXI claims that the City did not give TXI an opportunity to question the witnesses.  Ultimately, the Board unanimously decided on a compliance date of April 29, 2021.

### III.    The City's Claims of Violations and Complaints Against TXI

Before the City rezoned and amortized TXI's property, TXI claims that the City began taking actions that were designed to shut down TXI's concrete batch plant operations.  These actions include the City's claim that it had no record of TXI's compliance with the Agreed

Judgment, a noise study commissioned by the City, and the City's "enhanced enforcement" of certain noise regulations.

**A.  Alleged Non-Compliance with the Agreed Judgment**

On June 19, 2018 ("June 19 Letter"), the City sent TXI a letter indicating that the City had no record of TXI's compliance with the approved site plan attached to the Agreed Judgment and the Settlement Agreement (Dkt. #50-16, Exhibit 8 at p. 2).  In the June 19 Letter, the City requested TXI provide a site plan showing compliance with the requirements of the then-existing zoning ordinances rather than the approved site plan.

TXI claims that, since it began operations in 2001, it was not informed of any compliance issue with the Agreed Judgment or Settlement Agreement until the June 19 Letter.  Likewise, TXI claims this was the first time that the City indicated to TXI that it needed to comply with the 2018 zoning ordinances and not just the Agreed Judgment.

**B.  The Noise Study Conducted by the City**

According to the City, it received complaints from property owners in a nearby subdivision about TXI and CowTown's plants in late December 2017 and early 2018.  The City's solution was to conduct a noise study, which was meant to determine whether TXI and CowTown were violating certain decimal-based noise ordinances enacted by the City (Dkt. #86-4, Exhibit C).  The City conducted the noise study between April 24, 2018 and July 16, 2018.

As it pertains to TXI, the study included forty-four different observation periods from three different observation sites (Dkt. #86-4, Exhibit C at p. 9).  Additionally, the study included more than 2,000 written observations of the plant operation (Dkt. #86-4, Exhibit C at p. 15). According to the report that summed up the study's findings and conclusions, "there [was] no

evidence to substantiate complaints that noise from the facility violate[d] the Code" (Dkt. #86-4, Exhibit C at p. 13).

### C.  Enhanced Enforcement Against TXI

After the noise study was complete, the City notified TXI that the City would begin "enhanced enforcement" of its other noise ordinances.  TXI claims that it never received any explanation of what "enhanced enforcement" meant, how "enhanced enforcement" differed from regular enforcement, or why the City was enhancing its enforcement.  TXI claims, however, that it believes "enhanced enforcement" to mean enforcement against itself and CowTown, but no one else.

After instructing TXI that the City would begin enhanced enforcement, the City cited TXI for violation of McKinney Texas Code of Ordinances § 70-120(b)(7)—which mandates that no power equipment be operated between the hours of 10:00 p.m. and 7:00 a.m.—on two different occasions.  First, on September 4, 2018, for operating power equipment at 6:40 a.m. and again on October 5, 2018, for operating power equipment at 6:30 a.m. (Dkt. #59-7, Exhibit G at pp. 10–12).

## IV.    The Current Litigation

On April 21, 2020, TXI filed its complaint against the City, alleging that the City violated TXI's rights and attempted to shut down TXI's lawful business so that the City could acquire the land at little to no cost (Dkt. #1). On August 25, 2020, the City filed its answer, denying the claims.  Since its original filing, TXI has amended its complaint three times, most recently on July 18, 2022 ("Amended Complaint"), alleging much the same as its original complaint (Dkt. #99).  Likewise, the City responded on August 1, 2022 ("Amended Answer"), denying the claims made against it by TXI and asserting affirmative defenses (Dkt. #100).

On April 18, 2022, TXI filed Plaintiff's Motion for Partial Summary Judgment (Dkt. #59).  On May 9, 2022, the City responded (Dkt. #73).  On May 17, 2022, TXI replied (Dkt. #76).  Additionally, on May 10, 2022, the City filed City Defendants' Objections to Plaintiff's Summary Judgment Evidence and Motion to Strike (Dkt. #74).  On May 24, 2022, TXI responded (Dkt. #77).  On May 31, 2022, the City replied (Dkt. #80).

On April 19, 2020, the City filed City Defendants' Motion for Summary Judgment and Brief in Support (Dkt. #60) and on April 26, 2022, the City filed City Defendant's Amended Motion for Summary Judgment and Brief in Support (Dkt. #65).  On June 15, 2022, TXI responded (Dkt. #86).  On July 13, 2022, the City replied (Dkt. #96).  Additionally, on June 16, 2022, TXI filed Plaintiff's Resubmission of its Objections to Defendants' Summary Judgment Evidence and Motion to Strike (Dkt. #88).  On July 13, 2022, the City responded (Dkt. #97).

On June 16, 2022, the parties filed a Joint Motion Requesting Oral Argument on their competing motions for summary judgment (Dkt. #89).  On September 22, 2022, the Court entered an order granting the motion and set the hearing for October 11, 2022, at 1:00 p.m. (Dkt. #102).  At the hearing, the Court took the parties' arguments under advisement and has considered the arguments in deciding the current motions.

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  Substantive law identifies which facts are material.  *Id.*  The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment."  *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact.  FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323.  If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original).  Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case.  *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000).

Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial."  *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49).  A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment.  *Anderson*, 477 U.S. at 257.  Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden.  Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary

10

judgment.  *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982)

(quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)).  The Court must

consider all the evidence but "refrain from making any credibility determinations or weighing

the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

### I.     Objections to the Summary Judgment Evidence

Before the Court can address the motions for summary judgment, the Court must first

consider whether the exhibits that the parties objected to and requested that the Court strike

should indeed be struck.  TXI and the City filed motions to strike certain evidence presented in

their respective motions for summary judgment (Dkt. #74; Dkt #88).  TXI requests the Court

strike eight exhibits—Exhibits 4, 5, 8, 9, 10, 11, 12, and 18—and the City asks the Court to

strike two exhibits—Exhibits A and B.

#### A.  The City's Summary Judgment Evidence

TXI objects to the March 26, 2019 Planning & Zoning Commission Meeting List of

Property Owner Addresses for Notice (Dkt. #66, Exhibit 4 at p. 5), the March 26, 2019 Planning

& Zoning Commission Meeting Notice (Dkt. #66, Exhibit 5 at p. 6), the Public Responses

Regarding Batch Plant Rezoning (Dkt. #66, Exhibit 8 at pp. 26–56), Resolution No. 2019-12-145

(R) (Dkt. #66, Exhibit 9 at pp. 57–58), the February 12, 2020 Board of Adjustment Hearing

Newspaper Notice (Dkt. #66, Exhibit 10 at p. 59), the February 12, 2020, Board of Adjustment

Hearing Notice Letter (Dkt. #66, Exhibit 11 at p. 60), the February 12, 2020 Board of

Adjustment Hearing Property Owner Mailing Labels (Dkt. #66, Exhibit 12 at p. 61), and the

Amortization Study (Dkt. #66, Exhibit 18 at pp. 114–133) (Dkt. #88 at p. 2).  According to TXI,

each of these pieces of evidence constitutes inadmissible hearsay under Federal Rules of

Evidence 801(c) and 802.  The City counterargues that none of the evidence is inadmissible hearsay because the evidence falls into an exception.  Specifically, the City argues that the business records exception applies and, additionally, that the City has properly established the business records exception.  According to the City, since it properly established the business records exception, then it can introduce the objected to exhibits as evidence of the truth of the matter asserted.

Furthermore, TXI argues that the Public Responses regarding Batch Plant Rezoning are hearsay within hearsay.  Thus, according to TXI, the Public Responses regarding Batch Plant Rezoning (Dkt. #66, Exhibit 8 at pp. 26–56) are inadmissible because, even if the City can address the original hearsay issue under the business records exception, the complaints themselves would not fall under that exception.  The City responds that the Public Responses regarding Batch Plant Rezoning is admissible despite being hearsay within hearsay because the business records exception applies, and the City is not offering the evidence for the truth of the matter asserted.  Rather, the City is offering the Public Responses regarding Batch Plant Rezoning to show the effect on the listener.

The Court agrees with the City that none of the evidence challenged by TXI is inadmissible hearsay.  Evidence that would otherwise be inadmissible under the hearsay rule is nonetheless admissible if it falls within an exception.  See FED. R. EVID. 803.  Under Rule 803(6), records of a business's regularly conducted activity are admissible if the records were (1) made at or near the time of the activity record, (2) made by, or from information transmitted by, a person with knowledge of the activity recorded, (3) kept in the regular course of business, and (4) made in the regular course of the business.  *See id.*

"Since records maintained in the regular conduct of business are generally trustworthy and because such evidence is often necessary, 'the business records exception has been construed generously in favor of admissibility.'" *Morris v. B.C. Olympiakos, SFP*, 721 F. Supp. 2d 546, 550 (S.D. Tex. 2010) (quoting *Conoco Inc. v. Dep't of Energy*, 99 F.3d 387, 391 (Fed. Cir. 1997)).  The rule does not require that the witness who lays the foundation be the author of record, personally attest to its accuracy, or have personal knowledge of the record keeping practices of the business or the circumstances under which the specific records were kept.  *Id.* Rather, a qualified witness need only be able to "explain the record keeping system of the organization and vouch that the requirements of Rule 803(6) are met." *Id.*

Here, the City provided a business-records affidavit which meets the requirements of Rule 803(6).  Empress Drane, the City Secretary of the City of McKinney, submitted an affidavit in which she swore that she is the records custodian for the City and is familiar with the records maintained, generated, or compiled by the City.  According to Empress Drane's affidavit, the exhibits attached to the City's motion are true and accurate copies of records:

> kept by the City in the regular course of business, and it was the regular course of business of the City for an employee or representative of the City, with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or to transmit the information thereof to be included in such record; and the record was made at or near the time or reasonable soon thereafter.

(Dkt. #66-1, Exhibit 1 at p. 2).  Accordingly, the Court agrees with the City that the business records exception to the hearsay rule applies to the challenged evidence.

As to the Public Responses regarding Batch Plant Rezoning, the Court agrees with the City that the evidence is not hearsay within hearsay.  First, as the Court just addressed, there is no admissibility issue with the first layer of hearsay because the business records exception applies.  Second, there is no admissibility issue with the second layer of hearsay because the City is offering the statement to demonstrate the effect on the listener, not for the truth of the matter

13

asserted.  "Ordinarily, a statement is not hearsay if it is offered to prove the statement's effect on the listener."  *United States v. Reed*, 908 F.3d 102, 120 (5th Cir. 2018).  Here, the City is not using the evidence to prove the truth of the complaints from neighboring property owners. Rather, the City is using the evidence to prove the effect the complaints had on the City and how the City reacted to those complaints.[3]  The City may use the Public Responses regarding Batch Plant Rezoning to prove that the complaints had an effect on the City's officials and staff.

### B.  TXI's Summary Judgment Evidence

The City objects to the Declaration of H. Wayne Phears (Dkt. #59-1, Exhibit A at pp. 2–4) and the Declaration of Issam Al-Shmaisani (Dkt. #59-2, Exhibit B at pp. 2–4).

### 1.  Declaration of H. Wayne Phears

The City objects to the Declaration of H. Wayne Phears (Dkt. #59-1, Exhibit A at pp. 2–4).  According to the City, the declaration is inadmissible hearsay under Federal Rules of Evidence 801 and 802 and does not fall into an exception to hearsay.  The City also seems to argue that there is an issue of hearsay within hearsay relating to the statements about Baden Tax Management ("Baden").  TXI counterargues that the Declaration of H. Wayne Phears is not inadmissible hearsay because it is the declaration of a corporate representative, and corporate representatives are allowed to testify to matters that are clearly known to persons within the

---

[3] The City also made the argument that the actual complaints within the Public Responses regarding Batch Plant Rezoning are not hearsay within hearsay because the evidence falls under Federal Rule of Evidence 803(3), the then-existing state of mind exception to hearsay.  The Court disagrees.  According to Rule 803(3), evidence is not inadmissible as hearsay if it is a statement of the declarant's then-existing state of mind.  FED. R. EVID. 803(3).  Rule 803 is limited to declarations of condition, not declarations of belief.  *Bedingfield ex rel. Bedingfield v. Deen*, 487 Fed. App'x 219, 227–28 (5th Cir. 2012).  In other words, the exception only applies to statements about what the declarant's state of mind was, not why the declarant was experiencing that particular state of mind.  *Id.* at 228.  Accordingly, the exception only applies to statements such as, "I am upset" and not statements such as "I am upset because of the manufacturing plant that is next to my home."  Here, the complaints fall into the latter category.  The Public Responses regarding Batch Plant Rezoning explain *why* property owners are unhappy with the current zoning laws.  Accordingly, Federal Rule of Evidence 803(3) does not apply.

organization and, therefore, the organization itself.  The Court finds that the Declaration of H. Wayne Phears is admissible in part and inadmissible in part.

Federal Rule of Evidence 602 limits the scope of a witness's testimony to matters that are within his or her personal knowledge.  FED. R. EVID. 602.  A corporate representative, however, does not testify on his own behalf.  *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 434 (5th Cir. 2006).  Rather, a corporate representative testifies vicariously on behalf of the corporation and is therefore testifying as to the knowledge of the corporation, not himself.  *Id.* ("Accordingly, if a certain fact is within the collective knowledge . . . of [the corporation], [the representative] should be prepared on the issue . . . and allowed to testify as to it, even if it is not within his direct personal knowledge, provided the testimony is otherwise permissible lay testimony.").  "[I]t is common in civil litigation to permit corporate representatives to testify based on their review of business records."  *Rodriguez v. U.S. Bank, N.A.*, No. SA-12-CV-345-XR, 2013 WL 5948002, at *2 (W.D. Tex. Nov. 5, 2013) (holding that the court did not make a mistake when it permitted a defendant to rely on a corporate representative's affidavit during summary judgment when the corporate representative's knowledge was obtained from business records); *see also Martins v. BAC Home Loans Servicing, LP*, 722 F.3d 249, 256 (5th Cir. 2013) (upholding summary judgment on the basis of an affidavit from the defendant's chief administrative officer); *F.D.I.C. v. Selaiden Builders, Inc.*, 973 F.2d 1249, 1254–55 n.12 (5th Cir. 1992) ("[A]n affidavit can adequately support a motion for summary judgment when the affiant's personal knowledge is based on a review of her employer's business records and the affiant's position with the employer renders her competent to testify on the particular issue which the affidavit concerns.").  Of course, this does not allow corporate representatives to repeat "rank hearsay."  *Union Pump Co. v. Centrifugal Tech. Inc.*, 404 Fed. App'x 899, 908 (5th Cir. 2010)

(citing *Brazos River*, 469 F.3d at 435).  That is, a corporate representative cannot testify as to information he or she obtained merely from conversations with others in the organization.  *Id.* (holding that the district erred when it allowed a corporate representative to testify to information he learned only through conversations with other people at the company).

Here, portions of the Declaration of H. Wayne Phears contain statements that are undoubtedly hearsay because they are simple recitations of conversations H. Wayne Phears had with others.  For example, H. Wayne Phears states that he discussed notices with Baden's Chief Executive Officer, who advised him that any notices other than tax notices are sent by email to Martin Marietta (Dkt. #59-1, Exhibit A at p. 3, ¶5).  This is an out of court statement offered for the truth of the matter asserted.  Accordingly, all portions of the declaration that simply relay what H. Wayne Phears was told about how Baden conducts its business or how Baden handles notices is struck.  However, the portions of the declaration which relate to Martin Marietta or TXI are not struck as those portions of the declaration are based on either personal knowledge or the collective knowledge of the corporations gathered from business records and are not hearsay. *See Wojciechowski v. Nat'l Oilwell Varco, L.P.*, 763 F. Supp. 2d 832, 846 (S.D. Tex. 2011) ("However, '[t]he rule is settled that on a motion for summary judgment a court will disregard only the inadmissible portions of a challenged affidavit offered in support of or opposition to the motion and will consider the admissible portions in determining whether to grant or deny the motion.'") (quoting *Lee v. Nat'l Life Assurance Co.*, 632 F.2d 524, 529 (5th Cir. 1980)).  Additionally, because the Court struck all portions of the declaration relating to Baden, the Court need not address any hearsay within hearsay argument that the City may have made.

### 2.   Declaration of Issam Al-Shmaisani

The City also objects to the Declaration of Issam Al-Shmaisani (Dkt. #59-2, Exhibit B at pp. 2–4).  According to the City, the declaration is inadmissible hearsay under Federal Rules of Evidence 801 and 802 because the declarant reviewed business records which were not offered as evidence and were not accompanied by a separate business-records affidavit.  Additionally, the City argues that paragraphs four and five are irrelevant under Federal Rules of Evidence 401, 402, and 403.  TXI counterargues that the declaration is not inadmissible hearsay because a corporate representative is allowed to review records of the business to prepare themselves to testify.  Moreover, according to TXI, the declaration is relevant because the City is required to give notice to neighboring property owners, including CowTown.  Thus, whether CowTown did or did not receive notice of the rezoning, at least as it relates to TXI's property, makes it more likely that TXI did not receive notice either.  The Court agrees with TXI that the Declaration of Issam Al-Shmaisani is admissible.

A corporate representative can testify about knowledge gained by reviewing business records.  In fact, as the Court mentioned earlier, "it is common in civil litigation to permit corporate representatives to testify based on their review of business records."  *Rodriguez*, 2013 WL 5948002, at *2.  According to Fifth Circuit precedent, "an affidavit can adequately support a motion for summary judgment when the affiant's personal knowledge is based on a review of her employer's business records and the affiant's position with the employer renders her competent to testify on the particular issue which the affidavit concerns."  *Selaiden Builders, Inc.*, 973 F.2d at 1254–55 n.12.  Issam Al-Shmaisani's affidavit provided that he is "familiar with the facts set forth in this declaration, each of which is true and correct based on [his] personal knowledge or form information obtained by [him] from CowTown's business records" (Dkt. #59-2, Exhibit B

at p. 1).  The Court finds TXI has adequately shown that the Declaration of Issam Al-Shmaisani falls under the business records exception to the rule against hearsay.

Moreover, the Declaration of Issam Al-Shmaisani is relevant.  Evidence is considered relevant if it has any tendency to make a fact of consequence in determining the action more or less probable than it would be without the evidence.  FED. R. EVID. 401.  "Relevancy is broadly construed" and the bar for what is considered relevant is low.  *See Enron Corp. Savings Plan v. Hewitt Assocs., L.L.C.*, 258 F.R.D. 149, 159 (S.D. Tex. 2009) (quoting *Merrill v. Waffle House, Inc.*, 227 F.R.D. 467, 470 (N.D. Tex. 2005) (internal quotations omitted)).  When evidence is relevant, it is generally admissible.  See FED. R. EVID. 402.

Here, CowTown was entitled to receive notice of TXI's property rezoning because its property is within 200 feet of TXI's property.   Section 211.007(c) of the Texas Local Government Code requires a public hearing and that property owners be given notice before a city makes any zoning change:

> Before the 10th day before the hearing date, **written notice** of each public hearing before the zoning commission on a proposed change in a zoning classification **shall be sent to each owner**, as indicated by the most recently approved municipal tax roll, **of real property within 200 feet of the property on which the change in classification is proposed**.

TEX. LOC. GOV'T CODE § 211.007(c) (emphasis added).  Thus, whether CowTown did not receive notice makes it more probable that TXI did not receive notice.  The Declaration of Issam Al-Shmaisani is relevant.[4]

---

[4] The City also made the argument that Declaration of Issam Al-Shmaisani is inadmissible under Rule 403: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403.  However, aside from one conclusory sentence—"City Defendants object to paragraphs 4 and 5 of Shmaisani's declaration as irrelevant pursuant to Federal Rules of Evidence 401, 402, and 403"—the City provides no argument to support its claim and "it is not the Court's duty to make the parties' arguments for them."  *Meier v. UHS of Del, Inc.*, No. 4:18-CV-00615, 2019 WL 6465314, at *8 (E.D. Tex. Dec. 2, 2019); *see also Mendoza v. A&A Landscape & Irrigation*, LP, No. 4:12-CV-562, 2013 WL 12403556, at *2 (E.D. Tex. Nov. 26, 2013) ("It is not the obligation of the Court to make arguments on [the parties']

## II.    Grounds for Summary Judgment

TXI and the City filed competing motions for summary judgment.  TXI's motion for partial summary judgment relates to its breach of contract claim and its claim that the City failed to provide notice of the rezoning of TXI's property as required by Texas law.  TXI's motion argues that the Court should grant summary judgment on its breach of contract claim because the parties entered a valid contract—the Settlement Agreement—which the City breached. According to TXI, the City breached the Settlement Agreement when it (1) claimed TXI was in non-compliance with the approved site plan from the Settlement Agreement and Agreed Judgment, (2) revoked TXI's permanent certificate of occupancy, (3) rezoned TXI's property, and (4) amortized TXI's property.  The City counterargues that it did not breach the Settlement Agreement and that TXI misconstrues the meaning of the contract.  Additionally, the City argues that the contract is invalid because the City cannot contract away its police powers.

TXI's motion also argues that the Court should grant summary judgment on its claim that the City failed to provide notice for the rezoning of TXI's property because, under Texas law and the City's own ordinances, TXI was entitled to certain notices before the City rezoned TXI's property.  Therefore, TXI argues that the City violated its rights under the Due Process Clause, which makes the rezoning and amortization of its property null and void.  The City disagrees. Instead, the City claims that it sent all required notices and did not violate any of TXI's rights under the Due Process Clause.  Moreover, according to the City, TXI has no property interest that would give it rights under the Due Process Clause.

The City's motion for summary judgment contends that the Court should dismiss all TXI's claims.  According to the City, its decision to rezone and amortize TXI's property was to

_____

behalf, and find legal precedent to support those arguments, especially in light of the fact that [the parties] had ample time to brief the Court.").

bring the land use into conformity with the City's Comprehensive Zoning Plan.  The City's motion argues that it did not breach the Settlement Agreement with TXI because the Settlement Agreement only required the City to issue a revocable, permanent certificate of occupancy.  The City contends that the Settlement Agreement does not prevent the City from enforcing compliance with an approved site plan, rezoning TXI's property, or amortizing any future noncompliant use of the property.  Additionally, the City contends that interpreting the Settlement Agreement in the way that TXI proposes would foreclose the City's lawful exercise of its police power.

As to TXI's equal protection claim, the City's motion argues that the Court should grant summary judgment in favor of the City because TXI failed to identify a proper similarly situated comparator that was treated differently than TXI.  Moreover, the City contends that even if there was a similarly situated comparator that was treated differently than TXI, there was a rational basis for the City's actions.  TXI argues that the City treated it differently than it treated other properties.  In other words, TXI contends that the City singled out TXI for differential treatment when it rezoned TXI's property, enacted and imposed an amortization ordinance on TXI's property, and attempted to hassle and harass TXI into leaving.

The City's motion for summary judgment argues that the Court should dismiss TXI's request for declaratory relief that § 146-40(g)(3)(d) of the City's Code of Ordinances is unconstitutional.  According to the City, TXI lacks standing because § 146-40(g)(3)(d) was never applied to TXI.  TXI did not address this argument in its response to the City's motion.

Next, the City argues that the Court should grant summary judgment in its favor and dispose of TXI's claim that TXI's noise ordinances are vague and preempted by the Texas Constitution.  According to the City, TXI's arguments that the City's noise ordinances are

20

unconstitutionally vague and preempted by the Texas Constitution have no basis in fact. According to the City, the ordinance at issue—§ 70-120(b)(7), found in Article V of the McKinney Texas Code of Ordinances—clearly describes what is illegal and provides definitions for the terms the ordinance uses.  Additionally, the City points out that there is nothing in the Texas Constitution that prevents a city from implementing its own noise ordinances.  TXI counterargues that the ordinance is unconstitutionally vague because it does not concern noise at all, makes it a criminal offense to operate power equipment in certain areas between 10:00 p.m. and 7:00 a.m. yet requires no evidence of noise, and offers no definition of what constitutes power equipment.  TXI did not respond to the City's argument regarding whether the Texas Constitution preempts the City's noise ordinance.

Next, the City argues the Court should grant summary judgment in its favor on TXI's claim that the rezoning and amortization ordinances are unconstitutionally retroactive.  The City argues that the ordinances do not take effect prior to their passage and only apply prospectively; therefore, the laws cannot be retroactive.  Even if the Court determines the laws are retroactive, the City argues that the laws are not unconstitutional.  TXI counterargues that the laws are retroactive because they encroach on TXI's pre-enactment, settled rights and are, indeed, unconstitutional.

The City's motion for summary judgment, and its response to TXI's motion, also argues that the City has not violated any of TXI's due process rights, whether procedural or substantive. The City argues that the Court should deny TXI's request that the Court grant summary judgment on the notice issue.  Instead, the City contends that the Court should grant summary judgment in favor of the City for several reasons.  First, the City asserts that TXI has no protected property interest and therefore there can be no violation of TXI's due process rights.

21

However, the City also argues that the City sent and posted all necessary notices for the meetings and hearings the City held.  According to the City, because it complied with its statutory notice requirements and followed its usual practices and procedures when it provided notice to TXI, the City did not violate TXI's procedural due process rights.  Third, the City argues that TXI waived its procedural due process rights as to some of the hearings when TXI refused to provide information in response to a subpoena.  Fourth, the City argues it did not act arbitrarily; rather, its decisions had a rational basis.  TXI counterargues that it does have a protected property interest and that, procedurally, the City could not have sent the notices because TXI never received the notices, and the City has no proof of sending them.  Additionally, TXI disputes which standard the Court should apply when evaluating substantive due process: TXI believes the shocks the conscience standard applies while the City argues for a rational basis standard. According to TXI, the City's conduct was so severe that it shocks the conscience and, therefore, the City violated its substantive due process rights.

The City's motion also argues that the Court should grant summary judgment in the City's favor on TXI's regulatory taking claim because the change in zoning and amortization merely restrict TXI's use of the property and, while there might be some economic harm to TXI, the value of the property is not severely affected and there is no interference with distinct investment backed expectations.  TXI alleges that the City committed a regulatory taking when it rezoned and amortized TXI's property.  According to TXI, it suffered economic harm and there is no economically viable use of its land any longer.

Next, the City's motion for summary judgment argues that Chapter 245 of the Texas Local Government Code does not protect TXI's property.  TXI, on the other hand, argues that this is exactly the kind of project the Code was meant to protect and, therefore, the City cannot

change the laws as they apply to TXI, i.e., rezone and amortize TXI's property, because of TXI's certificate of occupancy.

Finally, the City argues that the Court should grant summary judgment in its favor because there is no controversy as to whether TXI's use of its property complies with the approved site plan or Agreed Judgment.  TXI did not respond to this argument.

The issues involved in the City's motion for summary judgment necessarily subsume the issues in TXI's motion for partial summary judgment.[5]  Thus, the summary judgment motions present several overlapping issues to be decided by the Court:

1.  Whether the City breached the Settlement Agreement or violated the Agreed Judgment;

2.  Whether the City denied Plaintiff equal protection under the law;

3.  Whether the City's noise ordinances are unconstitutionally vague;

4.  Whether the City's rezoning or amortization of Plaintiff's Property amounted to an unconstitutionally retroaction law;

5.  Whether the City violated Plaintiff's substantive or procedural due process rights;

6.  Whether the City committed a regulatory taking of TXI's property;

7.  Whether § 146-40(g)(3)(d) of the City's Code of Ordinances is unconstitutional;

8.  Whether the City's actions violated Chapter 245 of the Texas Local Government Code;

9.  Whether the Texas Constitution preempts the City's noise ordinances; and

10. Whether TXI violated the site plan put forth in the Agreed Judgment and Settlement Agreement.

The Court will examine these issues in turn, considering all the briefing together because of the substantial overlap in the arguments within the filings.

---

[5] As an aside, the City's motion for summary judgment also argues that the development agreement is not null and void.  However, TXI voluntarily dismissed its claims related to the development agreement (Dkt. #86 at p 12) ("TXI is satisfied with the City's Statement of Issues, except Issue number 8 which has been rendered moot by TXI's voluntary dismissal of its claims related to the Development Agreement.").  Therefore, this is no longer an issue the Court needs to resolve.

### a.  TXI's Breach of Contract Claim Fails

The City and TXI filed competing motions for summary judgment on TXI's breach of contract claim.  The City argues that the Court should dismiss the claim because the evidence conclusively establishes the City did not breach the Settlement Agreement.  TXI, on the other hand, argues that the Court should grant summary judgment in its favor because the City breached the Settlement Agreement when it rezoned TXI's property.

Under Texas law, a settlement agreement is a contract, and its construction is governed by contract law.  *Montanaro v. Montanaro*, 946 S.W.2d 428, 430 (Tex. App.—Corpus Christi 1997, no pet.) (citing *Old Republic Ins. Co. v. Fuller*, 919 S.W.2d 726, 728 (Tex. App.— Texarkana 1996, writ denied); *Stevens v. Snyder*, 874 S.W.2d 241, 243 (Tex. App.—Dallas 1994, writ denied); *see also Nuno v. Pulido*, 946 S.W.2d 448, 451 (Tex. App.—Corpus Christi 1997, no writ).  Under Texas law, there are four elements to a breach of contract claim: (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) damages sustained by the plaintiff because of the breach.  *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex. App.— Houston [1st Dist.] 2001, no pet.).

TXI contends that the City breached the Settlement Agreement—and violated the Agreed Judgment embodying the contents of the Settlement Agreement—because it "downzoned"[6] and amortized TXI's property.  According to TXI, the "permanent" certificate of occupancy the City issued to TXI under the Settlement Agreement was permanent in the literal sense, i.e., the City could not revoke the certificate of occupancy.  The City, on the other hand, claims it could not have breached the Settlement Agreement or have violated the Agreed Judgment because (1) the

---

[6] Throughout TXI's briefing, it repeatedly refers to the rezoning of its property as "downzoning."  However, it does not appear that this is a term of art.  Rather, it appears that this is a term coined by TXI to describe the unfavorable rezoning of its property.  Accordingly, the Court will refer to it as rezoning, not downzoning, throughout its Order.

contract impermissibly contracts away the City's police power and is therefore void, and (2) even if the Settlement Agreement or Agreed Judgment was a valid contract, neither the Settlement Agreement nor the Agreed Judgment prevent the City from revoking TXI's certificate of occupancy.

Essentially, the parties' arguments result in two issues for the Court to address.  First, whether the contract is void.  According to the City, interpreting the contract as TXI proposes would result in foreclosure of the City's police powers.  Second, whether, under the Settlement Agreement, the City's later actions result in a breach of the Settlement Agreement and Agreed Judgment.  In other words, was the City permitted to revoke TXI's permanent certificate of occupancy?

Because the Court determines that the word "permanent" should be interpreted as the City proposes, there is no need to determine whether the Settlement Agreement abdicates the City's police power.  The term "permanent" in the Settlement Agreement allowed the City to revoke TXI's certificate of occupancy; therefore, there was no way the Settlement Agreement could abdicate the City's police power.  Thus, the Court can dispose of TXI's breach of contract cause of action without needing to address the City's police powers argument.

### i.    Interpretation of the Word "Permanent" in the Settlement Agreement

Texas favors the freedom to contract, and courts should enforce the terms of the contract that the parties agreed to unless there are compelling reasons not to.  *Cent. Tex. Water Supply Corp. v. Kempner Water Supply Corp.*, 645 S.W.3d 799, 807 (Tex. App.—El Paso 2022, pet. denied).  "The primary concern of a court construing a written contract is to ascertain the true intent of the parties as expressed in the instrument."  *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004) (applying Texas law) (internal citations omitted).  "Objective manifestations of

intent control, not 'what one side or the other alleges they intended to say but did not.'" *Cent. Tex. Water Supply*, 645 S.W.3d at 808 (quoting *Gilbert Texas Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 127 (Tex. 2010)).  "In construing a contract under Texas law, courts must examine and consider the entire writing and give effect to all provisions such that none are rendered meaningless." *Id.*  Terms in the contract are given their plain, ordinary, and generally accepted meaning unless the contract shows that the parties used them in a technical or different sense. *Coker*, 650 S.W.2d at 393.  Although courts must look to the four corners of the contract to determine the parties' intent, the Texas Supreme Court "instructs that 'words must be construed in the context in which they are used.'" *Cent. Tex. Water Supply*, 645 S.W.3d at 808. And "the context of their use is not confined to the 'two-dimensional contractual environs in which the words exist but may also encompass the circumstances present when the contract was entered.'" *Id.*  However, courts may not exceed the limitations of the parol evidence rule. *Id.*

The parol evidence rule prevents a party to an integrated written contract from presenting extrinsic evidence for the purpose of creating an ambiguity or give a different meaning to the contract language. *Id.*  If the contract is ambiguous though, a court may consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the contract. *Id.* Whether a contract is ambiguous is a question of law to be decided by the Court. *Id.*  When determining if a contract is ambiguous, a court must ascertain and give effect to the parties' intentions as expressed in the writing itself. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Notably though, a contract is not considered ambiguous simply because the parties to the contract interpret it differently; rather both parties' interpretations must be reasonable to create an ambiguity. *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 743–44 (Tex. 2020), reh'g denied (Apr. 17, 2020).  Accordingly, "[a] contract is ambiguous when its meaning is uncertain and

doubtful or is reasonably susceptible to more than one interpretation." *Coker*, 650 S.W.2d at 393. If, on the other hand, a contract can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and a court will construe the contract as a matter of law. *Id.* If a contract is subject to two or more reasonable interpretations, and therefore ambiguous, it creates a fact issue and summary judgment is inappropriate. *Id.* Thus, as a threshold matter, the Court must first determine whether the contract is ambiguous, considering its language as a whole in light of well-settled construction principles and the relevant surrounding circumstances.[7] *Piranha Partners*, 596 S.W.3d at 743.

In the present case, the Settlement Agreement is not ambiguous. The Settlement Agreement provides that, "[t]he City agrees that it will . . . issue a permanent Certificate of Occupancy" (Dkt. #59, Exhibit 2 at pp. 3–4). TXI argues that a permanent certificate of occupancy was intended by the parties to mean that TXI's certificate of occupancy would be permanent.[8] Under this interpretation of the word permanent, the City could not revoke TXI's certificate of occupancy without breaching the Settlement Agreement and therefore violating the Agreed Judgment. The City counterargues that the word "permanent" is a term of art and that the City intended the word "permanent" to be interpreted according to the definition used by the City when it issues certificates of occupancy. Under this argument, the word "permanent" in the phrase "permanent certificate of occupancy" must be read and interpreted in comparison to the word "temporary" in a "temporary certificate of occupancy." The Court agrees with the City.

---

[7] Some relevant rules of construction include the rule requiring courts to construe contract language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise, the rule requiring courts to construe words in the context in which they are used, the rule requiring courts to avoid any construction that renders any provisions meaningless, and the rule requiring courts to consider and construe all of a contract's provisions together so that the effect or meaning of one part on any other part may be determined. *Piranha Partners*, 596 S.W.3d at 749 (internal citations omitted) (cleaned up).

[8] TXI never provides a definition for how the court should construe the term "permanent," aside from repeatedly asserting that "permanent" means "permanent."

Keeping in line with the parol evidence rule, courts may use "objectively determinable facts and circumstances that contextualize the parties' transaction" to help clarify the parties' intent as expressed in the contract. *Piranha Partners*, 596 S.W.3d at 749 (quoting *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 757–58). The Court cannot, however, rely on "such evidence to 'create ambiguity in the contract's text,' to 'augment, alter, or contradict the terms of an unambiguous contract,' to 'show that the parties probably meant, or could have meant, something other than what their agreement stated,' or to 'make the language say what it unambiguously does not say.'" *Id.* (internal citations omitted). Rather, the Court may use evidence of surrounding circumstances only to "aid the understanding of an unambiguous contract's language," "inform the meaning" of the language actually used, and "provide context that elucidates the meaning of the words employed." *Id.* (quoting *URI*, 543 S.W.3d at 757–59). Here, the surrounding circumstances support the City's proposed construction of the Settlement Agreement. Given that there are only two kinds of certificates of occupancy issued by the City, and there is nothing about the surrounding circumstances that indicates that the parties intended to assign a special, irrevocable meaning to the certificate of occupancy in the Settlement Agreement, the term "permanent" must fall within the technical definition.

The City regularly issues certificates of occupancy, both permanent and temporary. When a property owner receives a "temporary" certificate of occupancy, it is only valid for a definite period of time. Generally, the temporary certificate of occupancy will automatically expire at a date the City determines will allow a property owner to complete construction and meet all conditions precedent for a "permanent" or "full" certificate of occupancy.[9] Conversely,

---

[9] TXI claims that a "full" certificate of occupancy and a "permanent" certificate of occupancy are not the same thing. However, TXI has no support for this claim. The term "full" was used by Michael Quint during his deposition, but he used the term interchangeably with the term "permanent." There are several instances where Michael Quint refers to the certificate of occupancy from the Settlement Agreement as a "full" certificate instead of

when a property owner receives a "permanent" certificate of occupancy, the certificate is valid indefinitely and will not automatically expire.  A permanent certificate of occupancy may still be revoked though.  For example, a permanent certificate of occupancy may be revoked if there is a violation of one of the City's codes.

TXI proposed interpretation of the word "permanent" is not reasonable.  TXI repeatedly asserts that "permanent" means "permanent" without any reference to what the parties actually intended.  TXI does not even go so far as to provide the Court with any indication of what it argues the plain, ordinary, and generally accepted meaning of "permanent" might be.  Moreover, TXI's argument that the surrounding circumstances require the Court interpret the Settlement Agreement as TXI's proposes is unconvincing.  TXI points to several exhibits—the City's own pleading, a letter sent by the City in 1999 ("1999 Letter") (Dkt. #86, Exhibit F), the certificate of occupancy, and the City Manager's comment in a 2018 email ("2018 Email") (Dkt. #86, Exhibit N)—as proof that the surrounding circumstances support its contention that the term permanent in the Settlement Agreement means the certificate is literally permanent.  However, the exhibits cited by TXI only further lead the Court to conclude that the term "permanent" should be given its technical meaning.

For example, in the 1999 letter, the City's representatives explained to the Marriot Brothers that the current certificate of occupancy was only a temporary certificate (Dkt. #86,

---

as a "permanent" certificate, only to begin referring to it as a "permanent" certificate again later (Dkt. #86, Exhibit B at pp. 11–12, 30).  Moreover, TXI references the two terms used by Michael Quint in its motion (Dkt. #65 at pp. 9–10), clarifying that, as Michael Quint noted, there is no difference between the two:

> Q: You also - - counsel had made a reference to issuance of what he called a full or permanent certificate of occupancy.  To your knowledge, is there a difference between a full or permanent certificate of occupancy?
> A: No.

(Dkt. #86, Exhibit B at p. 30).  Accordingly, TXI's attempt to create a distinction between a full certificate of occupancy and a permanent certificate of occupancy to bolster its argument that "permanent" had a unique meaning in the Settlement Agreement is to no avail.

Exhibit F).  Once the temporary certificate expired, the Marriot Brothers would "be required to remove any structures and equipment from the site" (Dkt. #86, Exhibit F at p. 3).  However, "in order for permanent operations to occur," the Marriot Brothers would need to submit new site plans and make adjustments to the land (Dkt. #86, Exhibit F at pp. 3–4).  As the City contends has always been the case, the letter places the permanent certificate of occupancy in direct contrast with the temporary certificate of occupancy the Marriot Brothers had been operating under.   Likewise, in the 2018 Email, City Manager Paul Grimes was responding to complaints about CowTown when he noted:

> In the case of this concrete batch plant, it is a permanent, private business with zoning in place allowing the use to permanently and legally exist and operate thus these regulations being cited by interested residents are not applicable.  While the business, a concrete batch plant, does include the gathering and mixing sand and rock to create concrete, they are doing so as part of a legally operating business and not as part of a construction site or any on-site construction work

(Dkt. #86, Exhibit N at p. 2).  But the City's comments that CowTown, which was not a party to the Settlement Agreement, was also treated as "permanently" existing and operating supports the City's argument, not TXI's.  If the term "permanent" is unique to the Settlement Agreement, and is owed a special, irrevocable meaning, then it makes little sense for the City to use the same language in reference to other entities which were not part of the Settlement Agreement.

The surrounding circumstances and the rules of construction support the City's contention.  That is, the surrounding circumstances support that, out of the two certificates of occupancy the City issues, the City would issue TXI a permanent, or non-temporary, certificate of occupancy.  TXI's contention that the permanent certificate of occupancy referenced in the Settlement Agreement should be treated differently than all other permanent certificates of occupancy is unreasonable, does not make the meaning of the term "permanent" doubtful or

uncertain, and does nothing to open the term "permanent" up to more than one reasonable interpretation.  *See Coker*, 650 S.W.2d at 393.

The term "permanent" in the Settlement Agreement can be given a certain and definite legal meaning or interpretation, therefore it is not ambiguous, and the Court can construe the Settlement Agreement as a matter of law.  Because the Court construes the term "permanent" as the City proposes, TXI's claim that the City breached the Settlement Agreement and therefore violated the Agreed Judgment fails.  Accordingly, the Court grants the City's motion for summary judgment on TXI's breach of contract claim and denies TXI's motion for summary judgment on the breach of contract claim.

### b. TXI's Equal Protection Claims Fails Because TXI Did Not Identify a Similarly Situated Individual

In the City's motion, it argues that the Court should dismiss TXI's equal protection claim. TXI's response argues that there are factual disputes that prevent the Court from dismissing the action.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  "The purpose of the [E]qual [P]rotection [C]lause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents."  *Sioux City Bridge Co. v. Dakota Cnty*, 260 U.S. 441, 445 (1923) (internal quotations removed).  That is, the Equal Protection Clause requires that similarly situated people be treated alike.  *Jeffrey v. Bd. of Trustees of Bells ISD*, 261 F. Supp. 2d 719, 729 (E.D. Tex. 2003), *aff'd*, 96 Fed. App'x 248 (5th Cir. 2004) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).

TXI's equal protection claim is based on its contention that the City singled out TXI for differential treatment.  TXI argues that the City violated its rights under the Equal Protection Clause when it rezoned TXI's property, enacted and imposed an amortization ordinance on TXI's property, and "attempted to hassle and harass TXI into leaving" (Dkt. #86 at pp. 21–22).[10] The City, on the other hand, asserts that it had a rational basis for each of its actions, and therefore could not have violated the Equal Protection Clause.  Moreover, according to the City, TXI's claim is fatally flawed because TXI fails to identify a similarly situated individual who was treated differently.[11]  The Court agrees with the City.  There is a lack of evidence to support that there are any similarly situated individuals who were treated differently than TXI.  Thus, the Court does not need to reach the issue of whether the City had a rational basis for rezoning and amortizing TXI's property.

---

[10] TXI combines its substantive due process argument with its equal protection argument, at times switching between the arguments from one paragraph to the next with no indication as to whether it is addressing its substantive due process concerns or its equal protection concerns.  Insofar as TXI's motion can be read to suggest the Court should apply the "shocks the conscience" test to its equal protection claim, the Court rejects that argument.  Each case in support of the shocks the conscience test applies the test to a party's substantive due process claims, not any equal protection claims.  *Reyes v. N. Tex. Tollway Auth.*, 861 F.3d 558, 562 (5th Cir. 2017) (applying shocks the conscience to substantive due process claims); *Conroe Creosoting Co. v. Montgomery Cnty., Tex.*, 249 F.3d 337 (5th Cir. 2001) (same); *Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir. 1999) (same).

[11] The City notes that if TXI were to be similarly situated to anyone, it would be CowTown and Lhoist, the owners of the properties adjacent to TXI's own property.  In which case, the City argues that these individuals, while similarly situated, were not treated differently than TXI.  TXI, for its part, does not argue that the three companies are similarly situated.  Rather, TXI contends that itself, CowTown, and Lhoist are all part of one class of individuals, all of which the City treated improperly under the Equal Protection Clause.  It does appear that the three entities are similarly situated.  All three companies are manufacturing facilities, are located adjacent to one another in the area of McKinney that was rezoned, are subject to the same rezoning, and are subject to the same noise ordinances.  Additionally, both CowTown and TXI went through the same amortization process.  However, the City treated Lhoist and CowTown in the same manner it treated TXI.  Indeed, CowTown and Lhoist could not be similarly situated individuals who were treated *differently* than TXI because the City treated all three the same.  A fact TXI admits:

> Subjecting CowTown to the same arbitrary treatment does not save the City from an equal protection claim: whether the claim involves "a class of one or of five is of no consequence because . . . the number of individuals in a class is immaterial for equal protection analysis"

(Dkt. #86 at p. 26, n.107) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).  Likewise, in oral arguments before the Court, TXI explained to the Court that it considers both adjacent properties to be part of the same class as TXI.

TXI asserts that a jury could find for TXI under either a class-of-one theory or a selective enforcement theory.  Although similar, the theories require slightly different showings.  To establish a class-of-one claim, a plaintiff must show that (1) he or she was treated differently from others similarly situated and (2) there was no rational basis for the disparate treatment. *Olech*, 528 U.S. at 264.  To establish a selective enforcement claim, a plaintiff must show that (1) "that similarly situated individuals were treated differently" and (2) "the government official's acts were motivated by improper considerations, such as race, religion, or the desire to prevent the exercise of a constitutional right." *Villarreal v. City of Laredo*, 44 F.4th 363, 375 (5th Cir. 2022) (quoting *Bryan v. City of Madison*, 213 F.3d 267, 276–77 (5th Cir. 2000)).

Whether TXI has identified a similarly situated comparator that was treated differently is a requirement under both theories.  TXI identified no such individual.  Identifying a similarly situated comparator is a fact-intensive and case-specific inquiry. *Id.*  The Court must consider the "full variety of factors that an objectively reasonable . . . decisionmaker would have found relevant in making the challenged decision." *Lindquist v. City of Pasadena*, 669 F.3d 225, 234 (5th Cir. 2012) (internal quotations removed).  An equal protection claim will fail, however, if no similarly situated comparator is identified or if a similarly situated comparator is identified but the facts reveal the comparator is not actually similarly situated or was not treated differently. *See Graham v. Bluebonnet Trails Cmty. Servs.*, 587 Fed. App'x 205, 207 (5th Cir. 2014) (affirming the district court's decision to grant summary judgment on plaintiff's equal protection claim because the plaintiff failed to offer facts that would allow the court to determine who plaintiff's comparator was); *see also King v. N.Y. State Div. of Parole*, 260 Fed. App'x 375, 380 (2d Cir. 2008) (holding that because the plaintiff "failed to identify a single individual with whom he can be compared for Equal Protection purposes," his class-of-one equal protection

claim was properly dismissed); *Fahim v. Marriott Hotel Servs., Inc.*, No. 4:6-CV-4035, 2008 WL 1821513, at *5 (S.D. Tex. Apr. 22, 2008), *aff'd*, 551 F.3d 344 (5th Cir. 2008) ("Plaintiff's prima facie case fails, because she has produced no probative evidence of a similarly-situated person outside her protected class."); *Gonzalez v. United Parcel Serv., Inc.*, No. 5:15-CV-986, 2018 WL 4699274, at *6 (W.D. Tex. Sept. 28, 2018), *aff'd sub nom. Gonzalez v. United Parcel Serv.*, 777 Fed. App'x 735 (5th Cir. 2019) (granting summary judgment on an equal protection claim because the plaintiff "fail[ed] to identify specific, relevant comparators").

TXI essentially claims that its similarly situated comparator is every other property owner within McKinney. According to TXI, this is because the City has never treated any other property owners in this manner before:

> [T]he City has supplied its own comparators, admitting that, excepting CowTown, it has never (1) unilaterally downzoned [rezoned] another property to achieve compliance with a comprehensive plan; (2) amortized any of the many other nonconforming uses or structures in the City; and (3) subjected another use to 'enhanced enforcement' or revoked a certificate of occupancy for any violation

(Dkt. #86 at pp. 25–26). According to TXI, the City did this solely to eliminate TXI's industrial facilities and the industrial facilities on the adjacent tracts. Likewise, TXI's complaint notes that the only properties that the City is imposing noise standards on existing industrial facilities, rezoning, and targeting for acquisition are TXI's property and the two adjacent tracts owned by CowTown and Lhoist (Dkt. #99 ¶ 5.3.2). Additionally, TXI notes that the only industrial facilities the City has attempted to terminate by amortization are TXI's and CowTown's (Dkt. #99 ¶ 5.3.2).

TXI fails to direct the Court to any evidence which would support its contention that there actually are other properties that the City has never (1) unilaterally rezoned to achieve compliance with a comprehensive plan; (2) amortized because of nonconforming uses or structures; (3) subjected to "enhanced enforcement;" or (4) revoked a certificate of occupancy

for any violation.  That is, TXI has not actually named or identified a single property owner.  To the extent that TXI intended to identify every other property in McKinney as its comparator, it has essentially identified no comparator.  Not only is it impractical for TXI to claim that every other property within the city of McKinney is a comparator, but it fails to show how every, or any, other property is similarly situated.  To be sure, TXI would find it infeasible to show that every other property in McKinney is similarly situated to its own and TXI provides no evidence in support of this contention.

The City met its burden to prove that there is an absence of evidence to support one of the elements of TXI's equal protection claim, i.e., that the City treated TXI differently than a similarly situated individual.  Additionally, TXI did not carry its burden to set forth particular facts, supported by affirmative evidence indicating that there is a genuine issue for trial.  Thus, summary judgment on the equal protection claim is granted and the claim is dismissed.

### c.  The Noise Ordinance is Not Unconstitutionally Vague

The City's motion argues that the Court should dismiss TXI's claim that the City's noise ordinance—§ 70-120(b)(7)—is unconstitutionally vague because what the ordinance prohibits is clear.  TXI contends that the ordinance is too expansive, and that the expansiveness makes the ordinance unconstitutionally vague and unenforceable.

Vagueness stems from the Due Process Clause.  *Munn v. City of Ocean Springs*, 763 F.3d 437 (5th Cir. 2014) (citing *United States v. Williams*, 553 U.S. 285, 304 (2008)).  "The Due Process Clause requires that a law provide sufficient guidance such that a man of ordinary intelligence would understand what conduct is being prohibited."  *Williams*, 553 U.S. at 304 ("A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless

that it authorizes or encourages seriously discriminatory enforcement."); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."). Accordingly, courts must strike down ordinances that do not sufficiently define the line between legal and illegal conduct.

TXI claims that § 70-120(b)(7),[12] found in Article V of the McKinney Texas Code of Ordinances, is unconstitutionally vague and seeks declaratory judgment on the matter. According to TXI, § 70-120(b)(7) is unconstitutionally vague because it is in the noise ordinance section of the City's Code of Ordinances but does not concern noise at all.  Moreover, TXI contends that the ordinance makes it a criminal offense to operate power equipment in certain areas between 10:00 p.m. and 7:00 a.m. but requires no evidence of noise.  Finally, TXI argues that the ordinance offers no definition of what constitutes power equipment, making it impossible to know what the ordinance is prohibiting.  The Court, however, agrees with the City: The ordinance is not unconstitutionally vague.

The ordinance reads:

(7) Power equipment.

    (a) Operating or permitting to be operated any power equipment (as defined herein and excluding construction equipment which is specifically regulated above) within a residential district or quiet zone, or within 500 feet of any residence or quiet zone, in such a manner as to cause a noise

---

[12] TXI's complaint alleges that "the City's noise ordinances are unconstitutionally vague and too ambiguous to be fairly enforce and are therefore null and void" (Dkt. #99 at p. 20).  TXI does not identify which noise ordinances it is referring to, or if it referring to all of the City's noise ordinances.  However, in the City's motion for summary judgment and TXI's brief, only one noise ordinance is addressed.  Accordingly, any argument from TXI later on that any other noise ordinance is unconstitutionally vague is waived. *Graham v. Dall. Area Rapid Transit*, 288 F. Supp. 3d 711, 727 (N.D. Tex. 2017) (citing *Black v. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (plaintiff abandoned claim when she failed to defend claim in response to motion to dismiss); *Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002) (noting that "an issue raised in the complaint but ignored at summary judgment may be deemed waived . . . .")).

disturbance.    Furthermore,   any   such   activity   shall   create   a   noise
disturbance per se if conducted between the hours of 10:00 p.m. and
7:00 a.m.

(b) Operating or permitting to be operated any power equipment (as defined
herein and excluding construction equipment which is specifically
regulated above) within a nonresidential district in such a manner as to
cause a noise disturbance in violation of section 146-134.

McKinney, Tex. Code of Ordinances, § 70-120(b)(7).  Additionally, the statute defines power

equipment as "any motorized electric or fuel powered equipment, including, but not limited to -

tractors, lawnmowers, and other similar device or equipment."  *Id.* at § 70-119

TXI's argument that the ordinance is vague because it is in the noise section but does not

concern noise is not on point.  First, the ordinance plainly addresses noise.  Second, even if the

ordinance did not verbatim mention noise, the placement of the statute does not keep a person of

ordinary intelligence from understanding what conduct is being prohibited.  Likewise, the mere

fact that the ordinance does not require a certain decibel of noise does not make the ordinance

vague.  A person of ordinary intelligence can still understand that they are not permitted to

operate power equipment in certain areas at certain times of the day.

TXI's third argument, that the ordinance does not define "power equipment," does not

stand either.  The ordinance specifically defines power equipment.  Confusingly, as proof that

there is no definition of "power equipment," TXI points to a portion of Michael Quint's

deposition in which he was asked to explain what the definition of "power equipment" in § 70-

119 means.  For his part, Mr. Quint merely reiterates the definition from the statute while

providing a few extra examples of what that definition might include.  Regardless, the best

evidence of what constitutes power equipment is the language of the statute itself, not the

musings of a city official.  Here, the City's ordinance clearly defines "power equipment" as "any

motorized  electric  or  fuel  powered  equipment"  and  then  provides  several,  non-exclusive

examples of what kind of equipment that might include—tractors, lawnmowers, and other similar device or equipment.  MCKINNEY, TEX. CODE OF ORDINANCES, § 70-119.  While it is possible that the ordinance is overly broad, it is certainly not vague.  Moreover, it is not the Court's duty to make arguments or do the research on behalf of a party.  *See Mendoza*, 2013 WL 12403556, at *2 ("It is not the obligation of the Court to make arguments on [the parties'] behalf, and find legal precedent to support those arguments, especially in light of the fact that [the parties] had ample time to brief the Court.").  Thus, the Court will not address the issues of whether the ordinance is overly broad or whether other portions of the ordinance may be vague.

The Court agrees with the City's argument that § 70-120(b)(7) is not unconstitutionally vague.  Thus, summary judgment on the unconstitutionally vague claim is and the claim is dismissed.

### d.  Unconstitutionally Retroactive

The City argues that its zoning order and amortization ordinance are not unconstitutionally retroactive.  TXI responds that the zoning order and amortization ordinance are retroactive, meet the test for unconstitutionality, and the City cannot establish the ordinances serve a compelling public interest.

The Texas Constitution provides that "[n]o bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made."  TEX. CONST. art. I, § 16.  A retroactive law is a law that extends to matters that occurred in the past.  *Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698, 707 (Tex. 2014) (citing *Robinson v. Crown Cork & Seal Co.*, 335 S.W.3d 126, 138 (Tex. 2010)).  Thus, when determining whether a law is unconstitutionally retroactive, the threshold question is whether a law is retrospective or prospective in nature.  If

the Court concludes that a law is retrospective in nature, it will then determine if the law is unconstitutional.

While there is a heavy presumption against retroactive laws, not all retroactive laws are unconstitutional.  *Robinson*, 335 S.W.3d at 139.  "[T]he presumption against retroactive laws advances two fundamental objectives of our system of government: the protection of 'reasonable, settled expectations' and protection against 'abuses of legislative power.'"  *Fire Prot. Serv., Inc. v. Survitec Survival Prods., Inc.*, 649 S.W.3d 197, 201 (Tex. 2022), *reh'g denied* (Sept. 2, 2022).  To determine whether a Texas law is unconstitutionally retroactive, courts apply a test promulgated by the Texas Supreme Court in *Robinson*, in which it considers "the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings; the nature of the prior right impaired by the statute; and the extent of the impairment."  *Robinson*, 335 S.W.3d at 145.  Importantly, *Robinson* acknowledges the heavy presumption against retroactive laws by requiring a compelling public interest to overcome the presumption, while still balancing that presumption against the notion that statutes are not to be set aside lightly.  *Id.*

The City argues that its zoning ordinance and the amortization ordinance are not retroactive laws because they do not take effect prior to their passage and only prospectively alter TXI's future use of TXI's property.  According to the City, it is irrelevant that TXI's expectations which were developed prior to the laws' enactments were unsettled because the laws look forward on their face.  Moreover, even if the laws were retroactive, they would not be considered unconstitutional because they satisfy the *Robinson* test.  TXI counterargues that the laws are retroactive because they prohibit TXI's pre-enactment settled right to the continued legal use of TXI's property.  Additionally, TXI argues that the laws are unconstitutional because

39

the City cannot satisfy the *Robinson* test.  In other words, the City presents no evidence to support its contention that the laws serve a public interest, TXI's rights in the property are well-established, and the impairment of the laws on TXI's use of the property is severe.  The Court agrees with TXI that the ordinances are retroactive and the City did not satisfy the *Robinson* test.

### i.    The Ordinance is Retroactive

As mentioned, a retroactive law is a law that extends to matters that occurred in the past. That is, "[a] retroactive statute is one which gives pre-enactment conduct a different legal effect from that which it would have had without the passage of the statute." *Zaatari v. City of Austin*, 615 S.W.3d 172, 188 (Tex. App.—Austin 2019, pet. denied) (internal citations omitted).  The Supreme Court of Texas defines retroactive as "[e]xtending in scope or effect to matters which have occurred in the past; retrospective." *Robinson*, 335 S.W.3d at 138.  And retrospective as "[d]irected to, contemplative of, past time." *Id.*  Thus, when an ordinance extends in scope or effect to matters which have occurred in the past, or are contemplative of past time, it is considered a retroactive law.  Here, the ordinances-at-issue affect matters which occurred in the past and are therefore retroactive.

In reaching the conclusion that the ordinances are retroactive, the Court found *City of Corpus Christi v. Allen* helpful.  254 S.W.2d 759 (1953).  And, although the Texas Supreme Court dealt with whether land had been taken without due process and without compensation in the *Allen* case, the Texas Supreme Court's discussion of retroactive zoning laws applies well to the situation at hand.  In *Allen*, the city rezoned property occupied by a salvage company which had been operating for several years.  *Id.* at 759.  Based on the new zoning ordinance, the city instructed the plaintiff to cease operating its business and move to another location.  *Id.*  The

Texas Supreme Court described this type of zoning ordinance as attempting a retroactive effect.

*Id.* at 761.  Then, the Texas Supreme Court stated that

> [a]s a general rule, the restrictions of a zoning ordinance or regulation may not be made retroactive.  Such regulations must relate to the future rather than to existing buildings and uses of land, and ordinarily they may not operate to remove existing buildings and uses not in conformity with the restrictions applicable to the district, at least where such buildings and uses are not nuisances and their removal is not justified as promoting the public health, morals, safety, or welfare.

*Id.* (internal citations omitted).  Thus, the Supreme Court of Texas considers ordinances that affect existing buildings and uses of land, i.e., ordinances that rezone and amortize property, as having a retroactive effect.  *See id.*  In other words, ordinances that, when applied, work to remove buildings and uses that were already in existence when the ordinance was passed are retroactive.  *See id.*; *see also Zaatari*, 615 S.W.3d at 188 (concluding an ordinance was retroactive because it operated to eliminate well-established and settled property rights that existed before the ordinance was adopted); William R. Maurer, *An Idea Whose Time Has Gone: How Amortization Is Unconstitutional Retroactive Legislation in Texas*, 4 TEX. A&M J. PROP. L. 145, 156 (2017) ("Amortization certainly is retroactive—it takes a preexisting, legal use and converts it to a non-conforming, illegal use.  It fundamentally changes the way a piece of property may be used, regardless of how long that property has been devoted to that use.").

Here, TXI has been operating its concrete batch plant for two decades, long before the City rezoned and amortized TXI's property.  TXI expected, based on the Settlement Agreement and its permanent certificate of occupancy, that it could continue to lawfully use the land as a concrete batch plant.  Because the ordinances affect the *already-existing* buildings on TXI's property and use of TXI's property, they are retrospective in nature.  Thus, the zoning and amortization ordinances are retroactive.  Texas caselaw is clear, however, that "most statutes operate to change existing conditions" and "mere retroactivity is not sufficient to invalidate" an

ordinance.  *Robinson*, 335 S.W.3d at 139 (quoting *Tex. Water Rights Comm'n v. Wright*, 464 S.W.2d 642, 648 (Tex. 1971)).  To be sure, not every retroactive law is unconstitutional.  *Id.* Accordingly, the Court now turns to whether the law is unconstitutional.

### ii.    Nature of TXI's Rights

To determine whether a retroactive law is unconstitutional, courts must determine whether a party had "reasonable, settled expectations" that were disturbed by the retroactive law. *Survitec Survival*, 649 S.W.3d at 201.  The Court will begin by examining the nature of TXI's claimed property rights.

The City focuses on whether TXI has a vested right to the continued use of its property for a particular purpose.  The City's focus is misplaced.  Whether TXI had a vested right is irrelevant to the Court's analysis.  Indeed, the Supreme Court of Texas rejected the "vested rights" test and adopted a reasonable and settled expectations test.  *Robinson*, 335 S.W.3d at 147–48; *see also In re Occidental Chem. Corp.*, 561 S.W.3d 146 (Tex. 2018*)* ("In *Robinson v. Crown Cork & Seal Co.*, after an extensive analysis of our prior decisions and federal jurisprudence on retroactivity, we expressly rejected the vested-rights test . . . ."); *White Deer Indep. Sch. Dist. v. Martin*, 596 S.W.3d 855 (Tex. App.—Amarillo 2019, pet. denied) ("Our Supreme Court has rejected the "vested rights" analysis in favor of this three-factor inquiry.").  Accordingly, a law that upsets a person's settled expectations in reasonable reliance upon the law is unconstitutionally retroactive, regardless of whether the right is vested.  *Id.*  Here, the Court agrees with TXI that it had reasonable, settled expectations.

TXI illustrates its points using *Zaatari* and *City of Grapevine v. Muns*, 651 S.W.3d 317 (Tex. App.—Fort Worth 2021, pet. filed).  And although the City is right that leasing property is distinct from using property to operate a business, the Court nonetheless finds the analyses in

*Zaatari* and *Muns* helpful.   In *Zaatari*, the right at issue was the "'fundamental and settled property right' to lease one's real estate under the most desirable terms." *Zaatari*, 615 S.W.3d at 188.   The *Zaatari* Court began its analysis by recognizing that private property ownership is a fundamental right. *Id.*   Indeed, "[t]he right of property is the right to use and enjoy, or dispose of the same, in a lawful manner and for a lawful purpose." *Id.* (cleaned up).   The *Zaatari* Court then focused on evidence in the record which demonstrated the established practice and historical use of the property-at-issue for short term rentals, as well as the substantial time and money invested into the property-at-issue for that use. *Id.*   Ultimately, the *Zaatari* Court concluded that, based on the evidence in the record and the nature of real property rights, the plaintiffs had a settled interest in their right to lease their property short term. *Id.*

Similar to *Zaatari*, in *Muns*, the issue was whether the ordinance took away the plaintiff's "'fundamental and settled' . . . property rights . . . to lease their property on a short-term basis." 651 S.W.3d at 343.[13]   Like the City in this case, the city in *Muns* argued that the plaintiff had no vested right in the continued use of its property for a particular purpose and therefore the plaintiff's retroactivity claim was facially invalid. *Id.* at 344.   However, the city in *Muns* did not argue that the plaintiff failed to plead settled rights or that the rights they asserted are not settled. *Id.*   Rather, the city in the *Muns* case focused its entire argument on the rejected vested rights argument. *Id.*   Thus, because the Texas Supreme Court rejected the vested rights test and adopted the reasonable, settled rights test, the *Muns* Court concluded that the plaintiffs pleaded a facially valid retroactivity claim and denied defendant's jurisdictional plea. *Id.* at 344–45 ("Implicit in the Texas Supreme Court's rejection of the vested-rights test is that a settled right is not equivalent to a vested right . . . . Because the [plaintiff's] retroactivity claim hinges on settled

---

[13] Although *Muns* was an appeal of a district court's denial of its jurisdictional plea, not summary judgment, the Court nonetheless finds the discussion in *Muns* helpful in establishing what the correct and applicable test for this issue is in Texas.

rather than vested rights and the City has not argued that the [plaintiff's] pleaded rights are not settled, we conclude that the [plaintiff's] have pleaded a facially valid retroactivity claim.")

Here, the City's rezoning and amortization of TXI's property has the same effect as the retroactive ordinances in *Zaatari* and *Muns*—the elimination of well-established and settled property rights that existed before the laws were enacted.  As in *Zaatari*, the record establishes that TXI spent a significant amount of time and money investing in its property for the purpose of using it as a concrete batch plant, a use that was lawful when TXI invested its time and money.  Additionally, TXI's expectations directly touch on its real property rights as a private property owner.  And, as in *Muns*, the City does not argue that TXI does not have any reasonable, settled expectations.  As the Court has instructed multiple times now, it is not the Court's duty to make arguments or do the research on behalf of a party.  *See Mendoza*, 2013 WL 12403556, at *2 ("It is not the obligation of the Court to make arguments on [the parties'] behalf, and find legal precedent to support those arguments, especially in light of the fact that [the parties] had ample time to brief the Court.").  In support of its argument, the City needed to prove that TXI had no reasonable and settled expectations, not that it had no vested rights in the property.

Based on the record and the nature of real property rights, the City did not prove that TXI did not have a reasonable and settled expectation that it could continue to use its property as a concrete batch plant.  To the contrary, the Court concludes that TXI did have reasonable and settled expectations.  Now, the Court must analyze whether the ordinance disrupted or impaired TXI's reasonable, settled expectations.

### iii.     Extent of the Impairment of TXI's Rights

After determining the nature of TXI's rights, the Court must determine the extent to which the ordinances impair TXI's rights.  The City argues that TXI's rights are not impaired because the City provided TXI with an amortization period that allowed TXI to recoup its investments.  TXI, on the other hand, argues that there was a severe impairment of its rights because TXI entirely lost the ability to continue to use its property as a concrete batch plant. Moreover, TXI argues that it was unreasonable for the City to provide TXI with less than one year to close its plant and was provided no money to relocate its business.  Indeed, according to TXI, its impairment is akin to the impairment in *Zaatari*, because the ordinances entirely prohibit the historical use of its property.

When determining whether a law disrupts or impairs settled expectations, courts consider whether the law gives parties a "grace period" to adapt before the law takes effect.  *Survitec Survival*, 649 S.W.3d at 201–02.  Grace periods are required by the Texas Constitution.  TEX. CONST. art. III, § 39.  Moreover, a grace period may act as a cure to retroactivity.  *See Mbogo v. City of Dallas*, No. 05-17-00879-CV, 2018 WL 3198398, at *7 (Tex. App.—Dallas June 29, 2018, pet. denied) ("Courts have long recognized that the impairment of a right may be lessened when an ordinance affords a plaintiff a grace period to bring a claim or a reasonable time to protect his investment.").

On November 5, 2019, the City Council enacted the ordinance that established the authority of the Board to amortize property.  On December 3, 2019, the City Council voted to request that the Board consider the amortization of TXI's property under the statute.  Although neither party provides an effective date for the ordinance, it appears as though the ordinance was effective at least within a month of being enacted, as the City Council was using it by December

3, 2019.  Additionally, on July 29, 2020, the Board voted to initiate an amortization of TXI's property, deciding on an amortization compliance date of April 29, 2021.

Here, the impairment is severe because it eliminates TXI's right altogether.  Indeed, the effect of the ordinance on TXI's property right is unmistakable: the City's ordinance eliminates TXI's reasonable, settled expectations to use the property as a concrete batch plant.  And, as TXI points out, the elimination of a right has a significant impact on that right.  *See Zaatari*, 615 S.W.3d at 191 (citing *Robinson*, 335 S.W.3d at 148).  However, the City argues that the amortization period acts as the grace period in this case, curing the retroactivity and alleviating the impairment of TXI's rights.  According to the City, there is no question that the amortization period satisfies the requirements of a grace period under Texas law.  In support of this proposition, the City cites to *City of University Park v. Benners*, 485 S.W.2d 773 (Tex. 1972).[14]

According to *Benners*, "new zoning ordinances terminating an owner's existing use of a property must give the property owner a reasonable period to recoup his investment in that use." *Id.* at 779.  In *Benners*, the Texas Supreme Court held that the reasonableness of an individual's opportunity to recoup his or her business is measured by the conditions at the time the existing use is declared nonconforming.  *Id.*  Additionally, when determining if the recoupment period is reasonable, courts may consider "[t]he sufficiency of time allowed to economically wind down the business on the present location and make new plans for continuing the business elsewhere." *Id.* at n.7.  Under these guidelines, the City argues that "there is no question that Plaintiff's amortization period satisfies the principle that a property owner must be given a reasonable time to recoup his investment in that use" (Dkt. #65 at p. 25).  However, the City does not support this

---

[14] *Benners* applied the vested rights test that the Supreme Court of Texas rejected in *Robinson*.  However, in *Robinson*, the Texas Supreme Court only rejected some, but not all, principles applied in prior cases dealing with unconstitutionally retroactive laws.  *Robinson*, 335 S.W.3d at 145–47.  Of importance here, *Robinson* had no effect on the portion of *Brenner* that discusses grace periods.  *Id.*  Thus, the discussion of grace periods in *Benners* is still considered good law and is applicable to the Court's analysis of the grace period in the current case.

statement with the facts of the case.  Indeed, the City merely states that the amortization period satisfies this *Robinson* factor under the evidence presented to the Board, without referencing what that evidence was.  TXI, on the other hand, argues that the amortization period of less than a year is not reasonable to close a plant that has operated for nearly twenty years.  Furthermore, TXI argues that it was not reasonable for the City to not compensate TXI for the closure of its plant when the cost for TXI to relocate or build a new plant would be significant.  Based on the summary judgment evidence presented, it is unclear what a reasonable grace is.  Accordingly, whether the amortization period was reasonable depends on facts and circumstances that have not been fully developed.

The City has not shown that the amortization period here was reasonable.  Specifically, the City has not shown that the amortization period allowed TXI to recoup its investment.  Thus, the Court is left with material issues of fact as to the reasonableness of the amortization period. Without first resolving these material issues of fact, Court cannot determine whether this factor weighs in favor of the retroactive law being unconstitutional.   Indeed, "before rendering judgment the Court must be satisfied not only that there is no issue as to any material fact, but also that the moving party is entitled to a judgment as a matter of law."  *Palmer v. Chamberlin*, 191 F.2d 532, 540 (5th Cir. 1951) ("Where . . . the decision of a question of law by the Court depends upon an inquiry into the surrounding facts and circumstances, the Court should refuse to grant a motion for a summary judgment until the facts and circumstances have been sufficiently developed to enable the Court to be reasonably certain that it is making a correct determination of the question of law.").

### iv.    The Public Interest

Now, the Court must determine whether the ordinance serves a compelling public interest.  Here, the City claims that the public interest is served "by saving nearby properties in the community from adverse impacts resulting from Plaintiff's continued operations" (Dkt. #65 at p. 25).  Save this sentence, the City does not elaborate on how the amortization serves the public interest, much less how it serves a compelling public interest as required by *Robinson*.  Without more, the City cannot overcome the heavy presumption against retroactive laws.  Accordingly, the City did not carry its burden and summary judgment in its favor on the issue of retroactivity is not appropriate.

### e.  Due Process

The parties' motions for summary judgment present substantive and procedural due process issues.  The City's motion argues that the Court should dismiss all due process claims because TXI does not have a viable substantive or procedural due process argument.  TXI responds that its substantive due process claims are riddled with factual disputes and that its procedural due process rights were violated because the City did not provide proper notice before depriving TXI of its property interest and did not allow TXI to participate in the amortization hearing in a meaningful way.  TXI's motion, on the other hand, argues that the Court should grant summary judgment on the issue of notice.  That is, TXI argues in its motion that the City violated its procedural due process rights when it failed to provide notice for the rezoning of TXI's property.  Thus, the City's motion addresses substantive and procedural due process on all counts, and TXI's motion addresses procedural due process only as it pertains to the issue of notice.

48

The Fifth Amendment to the United States Constitution provides that "No person shall . . . be deprived of life, liberty or property, without due process of law."  U.S. CONST. amend. V.  The Fourteenth Amendment applies that law to the states by stating "nor shall any State deprive any person of life, liberty, or property without due process of law."  U.S. CONST. amend. XIV § 1.  Procedural due process requires notice and an opportunity to be heard. *Matthias v. Bingley*, 906 F.2d 1047, 1051 (5th Cir. 1990).  Indeed, "[t]he Due Process Clause permits persons whose interests may be adversely affected by government decisions to participate in those decisions."  *Id.* at 1052.  Substantive due process, on the other hand, bars certain government actions "when [they] can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense."  *Breen v. Tex. A&M Univ.*, 485 F.3d 325, 332 (5th Cir. 2007).  However, plaintiffs must identify the protected life, liberty, or property interest at issue when alleging violations of due process, regardless of whether it is procedural or substantive due process.  *Baldwin v. Daniels*, 250 F.3d 943, 946 (5th Cir. 2001); *Brennan v. Stewart*, 834 F.2d 1248, 1257 (5th Cir. 1988).  Thus, the Court first addresses whether Plaintiff has identified a proper protected life, liberty, or property interest; the Court will then turn to the individual inquiries for procedural and substantive due process.

### i.    There is a Protected Interest Under the Due Process Clause

The City argues that TXI has no protected property interest and therefore its due process claims fail.  According to the City, TXI cannot acquire vested rights in a zoning classification or use of its property for a particular purpose.  TXI counterargues that it does have a protected property interest because it has the right to continue operating a business pursuant to a permanent certificate of occupancy, approved site plan, Agreed Judgment, and Settlement Agreement with

the City.  The Court agrees with TXI, but only to the extent that it has a protected property interest in the certificate of occupancy.

In Texas, a property interest exists where an entity "has a legitimate claim of entitlement that is created, supported, or secured by rules or mutually explicit understandings."  *Jabary v. City of Allen*, 547 Fed. App'x 600, 606 (5th Cir. 2013) (quoting *City of Houston v. Carlson*, 393 S.W.3d 350, 357 (Tex. App.—Houston [14th Dist.] 2012)) (cleaned up).  "Privileges, licenses, certificates, and franchises . . . qualify as property interests for purposes of procedural due process."  *Bowlby v. City of Aberdeen*, 681 F.3d 215, 220 (5th Cir. 2012).  However, to have a property interest in a government benefit, a plaintiff must have more than a unilateral expectation of that benefit.  *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *see also Smith v. Travis Cnty. Bail Bond Bd.*, 559 S.W.2d 693, 694 (Tex. App.—Austin 1977, no writ) (holding plaintiff had no property interest in expired license); *Shrieve v. Tex. Parks & Wildlife Dep't*, No. 03–04–00640–CV, 2005 WL 1034086, at *5–6 (Tex. App.—Austin May 5, 2005, no pet.) (mem. op.) (holding that Shrieve's expectation of a permit was not a protected property interest).  Instead, a plaintiff must have a legitimate claim of entitlement to the benefit.  *See Smith*, 559 S.W.2d at 694.  Accordingly, "once issued, a license or permit cannot be taken away by the State without due process" because there is a property interest in the license or permit.  *See Bowlby*, 681 F.3d at 220; *see also Jabary v. Terrell*, No. 4:10-CV-711, 2014 WL 6984217 (E.D. Tex. July 17, 2014), *R&R adopted*, No. 4:10-CV-711, 2014 WL 6984126 (E.D. Tex. Dec. 10, 2014) ("A property interest such as a 'license or permit,' . . . is protected by the Fourteenth Amendment and thus 'cannot be taken away by the State without due process.'").

Here, the City approved TXI's site plan and granted TXI a certificate of occupancy only to later revoke it.  *See, e.g., House of Tobacco, Inc. v. Calvert*, 394 S.W.2d 654, 657 (Tex. 1965)

(holding that, although license to wholesale cigarettes was a privilege that did not have to be granted, once granted, it could not be taken away except for good cause; therefore, wholesaler was entitled to due process).   TXI has a protected property interest in the certificate of occupancy, and it cannot be taken away without due process of law.  *See Bowlby*, 681 F.3d at 220.  It is important to note that this is not a protected property in the use of the property for a particular purpose.  Rather, this is a protected property interest in the certificate of occupancy the City issued which allowed TXI to use the property for a particular purpose.  If there was no certificate, there would be no protected property interest.

### ii.    Procedural Due Process

After a court determines there is a liberty or property interest that the government has interred with, it must determine "whether the procedures attendant upon that deprivation were constitutionally sufficient."  *Wooten v. Roach*, 431 F. Supp. 3d 875 (E.D. Tex. 2019) (internal citations omitted).  The Fifth Amendment entitles individuals to be heard at a meaningful time—generally before deprivation of the property interest at issue—and in a meaningful manner—generally through notice and some form of hearing.  *Id.*  What process is due depends upon the facts of the case and requires courts consider three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

The City argues that TXI's procedural due process rights were not violated because the City sent or posted all the necessary notices, TXI chose not to attend some hearings, and TXI waived certain rights to participate in the hearings it did attend.  According to the City, it

presented evidence that it sent notices in accordance with its usual procedures for sending notices of this type; therefore, the evidence is sufficient to show that the notices were sent.  TXI's motion argues that it is entitled to summary judgment because the City never sent TXI the proper notices relating to the rezoning and never posted notices in the newspaper relating to the rezoning.  Additionally, TXI argues that (1) the City's summary judgment evidence is not enough to establish it sent TXI the proper notices and (2) the City impermissibly prevented TXI from participating in the July 29, 2020 meeting in a meaningful way because TXI did not respond to the City's subpoena duces tecum.

### 1.  Notice

TXI, and owners of neighboring properties, were entitled to notice of hearings and proposed changes to TXI's property under the Texas Local Government Code and the City of McKinney's Code of Ordinances.  Section 211.007(c) of the Texas Local Government Code requires a public hearing and that property owners, both of the property affected and of the properties within 200 feet of the property affected, be given at least ten days' notice before a city makes any zoning change.  TEX. LOC. GOV'T CODE § 211.007(c).  Similarly, McKinney's Code of Ordinances requires a hearing and notices to the same individuals before changes to a property, but notice must be given at least eleven days before.  MCKINNEY, TEX. CODE OF ORDINANCES, § 146-164(2)(a).

It is true that "[t]here is a presumption arising from the mailing of a letter that it was received . . . ."  *Mobile Am. Sales Corp. v. Gradley*, 612 S.W.2d 625, 628 (Tex. App.— Beaumont 1980, no writ).  However, "the presumption arises only after proof has been made that the letter was properly addressed to the addressee, stamped with the proper postage, and that it was mailed."  *Id.*  In *Gradley*, there was competing evidence as to whether plaintiff ever received

52

copies of a contract or insurance policy.  *Id.*  The plaintiff testified that she did not receive either document, while the defendant had testimony that someone had seen the envelopes containing the document, but there was no testimony that anyone had deposited the envelopes in the mail or seen anyone else do so.  *Id.*  "There was no direct evidence that such contract and policy were not mailed by defendant; nor [was] there any direct evidence from any source that such instruments were in fact mailed by defendant to plaintiff."  *Id.*  Ultimately, the court held that "[w]hile plaintiff could not prove what went on in defendant's office, she did offer proof which, in legal effect, raised an issue of fact as to the presumption of receipt of the letter because of its mailing."  *Id.*

Here, the City points to deposition testimony that the City claims establishes that it sent out notices in accordance with its usual procedures.  The evidence the City uses to establish notice was sent is overall lacking.  The deposition testimony of Kathy Wright establishes what the procedures are for addressing city postcards—a process called mail merge—and that the city had documents indicating the names and addresses of the properties to be noticed, as well as the property owners (Dkt. #66-2 at p. 237).  However, nothing in the testimony or record conclusively establishes that these procedures were actually followed in this case.  Instead, the City merely points to deposition testimony that recites what procedures should have been followed in this case if everything was done correctly.  That is, there is no actual testimony that the procedures were followed.  No employee of the City testified that the postcards for each owner were created, just that there was a draft postcard.  No employee of the City testified that the postcards were sent to the mail merge system to be addressed, just that finalized postcards are normally sent to the mail merge system.  No employee of the City testified that the postcards were at any point placed in the mail to be sent.  Additionally, the City provides no evidence of

any receipt from the post office for mailing the notices to the individual owners.  Although these distinctions may seem small, the presumption that mail was sent only arises when there is testimony that the usual procedures *were* followed in a specific case.  Testimony simply stating what procedures *should be* followed is not enough.

The evidence the City claims establishes that notice was posted in the newspaper is likewise lacking.  The City provides no copies of the newspaper it claims to have published the hearing notices in.  Nor does the City provide receipts showing that the City paid for the notices to be published.  According to the City, it "is not legally required to keep copies of such mailings or receipts on file"  (Dkt. #73 at p. 16).  While that may be true, that does not excuse the City from presenting evidence to establish that it gave TXI notice.  Similarly, TXI has also failed to prove it is entitled to summary judgment on the issue of notice.  As discussed, TXI provided evidence that it did not receive notice in the form of deposition testimony.  The competing evidence provided by the City and TXI does no more than create a fact issue.  Neither party proved they were entitled to summary judgment on TXI's lack of notice claim.  Thus, summary judgment on this issue is denied as to both parties.

### 2.   Opportunity to be Heard

The Fifth Amendment entitles individuals to be heard at a meaningful time and in a meaningful manner.  The City argues that TXI voluntarily waived its right to be heard at the amortization hearing because it did not respond to a subpoena from the City requesting TXI's financial documents.  TXI counterargues that due process requires the opportunity to review and challenge the government's evidence.  According to TXI, the City vested the Board "with the sole authority to issue subpoenas, determine compliance, and adjudicate the amortization period—all without any opportunity for objection" (Dkt. #86 at p. 36) (citing MCKINNEY, TEX.

54

CODE OF ORDINANCES § 146-40(g)(3) (2007)).   And, under the City's ordinances, "[a]n objecting landowner waives 'any and all rights' to challenge the 'evidence, information, testimony, theories, conclusions, analysis, opinions and results submitted to the board," and the City need not share any of its evidence.'" (Dkt. #86 at p. 36) (citing MCKINNEY, TEX. CODE OF ORDINANCES § 146-40(g)(3) (2007)).   The City responds that, under § 146-40(g)(3), the City provided ample procedural due process, but TXI refused to participate and therefore waived its procedural due process rights.

While due process rights may be waived, any waiver must be done knowingly and voluntarily.  *McCarthy v. Mukasey*, 555 F.3d 459, 462 (5th Cir. 2009).  An effective waiver of a constitutional right requires a finding that the waiver was an "'intentional relinquishment or abandonment of a known right or privilege.'"  *Bueno v. City of Donna*, 714 F.2d 484, 492 (5th Cir. 1983) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).  "A knowing and intelligent waiver requires (1) knowledge of the right to the process due, and (2) the actual existence of that process."  *Id.* at 493.  In analyzing whether a waiver was made knowingly and voluntarily, courts "must indulge in every reasonable presumption against a waiver."  *Nose v. Attorney Gen. of U.S.*, 993 F.2d 75, 79 (5th Cir. 1993).  Purported waivers of fundamental constitutional guarantees are subject to the "most stringent scrutiny."  *In Re Bryan*, 645 F.2d 331, 333 (5th Cir. 1981).  The record must reflect a basis for the conclusion of actual knowledge of the existence of the right or privilege, full understanding of its meaning, and clear comprehension of the consequence of the waiver.  *United States v. Escandar*, 465 F.2d 438, 441 (5th Cir. 1972).

Here, the City does little to show that TXI waived its right to participate in the amortization proceedings in a meaningful way simply because TXI did not provide the documents the City requested.  The evidence on summary judgment does not rise to the level of

establishing a waiver.  The Court cannot conclude that TXI waived its right to a hearing with sufficient awareness of the relevant consequences simply because it did not give the City its financial information.  Moreover, the City provides no caselaw in support of its argument that TXI's failure to provide financial documents in response to a subpoena can properly result in the government lawfully disallowing TXI to participate in the hearing.  To the contrary, TXI arrived at the hearing fully prepared to participate, but was refused any participation beyond that of the three minutes given to all those at the meeting.  Additionally, the City refused to allow TXI to challenge any of the evidence heard.  Given the circumstances of the case, the City has not carried its burden on the procedural due process issues surrounding the July 29, 2020 hearing. Summary judgment on this issue is not appropriate.

As mentioned, the parties filed competing motions for summary judgment on TXI's procedural due process claim.  Accordingly, both parties had the burden to prove the Court should grant summary judgment in their favor.  The City challenged procedural due process on all claims, meaning it was required to show that the notices were sent and that it gave TXI a meaningful opportunity to be heard.  TXI asked for summary judgment on its due process claims only as they relate to the issue of notice.  Neither party met their burden.  Thus, summary judgment on the procedural due process claim is denied as to both parties.

### iii.    Substantive Due Process

The Due Process Clause guarantees more than procedural fairness, it also bars "government actions regardless of the fairness of the procedures used to implement them."  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).  "The touchstone of due process is protection of the individual against arbitrary

action of government," but what is considered unconstitutionally arbitrary under the Due Process Clause depends on what standard is applied.  *See id.* at 845.

The parties dispute which substantive due process standard applies under the facts of the case.  TXI argues that, when government action is individualized, the Court must analyze substantive due process claims under a shocks the conscience test.  The City counterargues that, when a substantive due process claim relates to a municipal land-use decision, the Court must analyze substantive due process under the rational basis test.  The Court agrees with TXI, the correct standard is whether the City's conduct shocks the conscience.

Generally, when there is a claim of a substantive violation of the Fifth Amendment, courts apply the rational basis standard.  *Reyes*, 861 F.3d at 561.  Under rational basis review, a government's actions constitute a substantive violation of due process if the actions are not rationally related to a legitimate government interest.  *Id.*  On the other end of the spectrum is the "shocks the conscience" test.  In *Rochin v. California*, the Supreme Court recognized the "shocks the conscience" standard.  342 U.S. 165 (1952).  Under this standard, a government's actions are a substantive violation of due process if the actions are "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  *Reyes*, 861 F.3d at 562.

As a general rule, courts apply a shocks the conscience standard to executive actions and a rational basis standard to legislative actions.  *Id.*  In *Reyes*, the Fifth Circuit articulated the dichotomy of the standards as broad versus individualized action.  *Id.*  In other words, when government action applies broadly then courts will use the rational basis standard and when government action is individualized to one or a few plaintiffs then courts will use the shocks the conscience standard.  *Id.*  Notwithstanding these general rules, "[s]ome due process challenges blur along the executive/legislative line, such as when a broadly applicable rule is challenged

only as it applies to a particular situation." *Id.*  This case in particular seems to blur the line. Despite TXI's challenge to specific ordinances, i.e., legislation that applies broadly, TXI's complaint is, by and large, that the City's actions against TXI specifically violated its Fifth Amendment rights.  TXI's claims are not a challenge to the City's actions as they apply broadly. Accordingly, the Court will apply the shocks the conscience standard.

"[T]he measure of what is conscience shocking is no calibrated yard stick." *Lewis*, 523 U.S. at 847.  Conduct must do more than "offend some fastidious squeamishness or private sentimentalism." *Rochin*, 342 U.S. at 172.  Rather, the government must intend its conduct to injure the plaintiff in some way unjustifiable by any government interest. *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 251 (5th Cir. 2018).  In some cases, courts find conduct to be conscious shocking when the plaintiff is injured because of the government's deliberate indifference. *Id.* To prove that conduct shocks the conscious, the Fifth Circuit requires "plaintiffs to show that the State 'at a minimum acted with deliberate indifference toward the plaintiff.'" *Id.*  Even this minimum requirement of "deliberate indifference is 'a significantly high burden for plaintiffs to overcome.'" *Id.* at 252.

Here, TXI asserts that the City violated its substantive due process rights in a myriad of ways.  In particular, TXI claims that its substantive due process rights were violated when the City made unfounded claims that TXI did not have an approved site plan, threatened TXI with unequal enforcement of ordinances, engaged in unequal enforcement of ordinances, claimed TXI violated noise ordinances without any factual basis for the claims and knowing the ordinance was unenforceable, held hearings without allowing TXI to participate in a meaningful way, rezoned TXI's property without giving notice, conducted amortization proceedings after issuing illegal and invalid subpoenas, and, lastly, ordered TXI cease its plant operations by April 29,

2021.  As the Court has discussed throughout this order, many of TXI's substantive due process contentions, however, are riddled with factual disputes.  For example, it is still unclear whether the notices the City was required to send by ordinance and statute were actually sent.  There is also a genuine issue of material fact as to whether the City actually engaged in unequal enforcement of noise ordinances or whether TXI was prevented from participating in hearings in a meaningful way.  Thus, summary judgment on this issue is inappropriate.

The City did not carry its burden.  Accordingly, summary judgment on the issue of substantive due process is inappropriate.

### f.   Regulatory Taking

The City's motion argues that the Court should grant its motion for summary judgment and dismiss TXI's regulatory taking claim.  TXI's response argues that there are factual disputes that prevent the Court from dismissing the action.

The Fifth Amendment prohibits the government from taking private property for public use without just compensation.  While this is often a physical taking, *United States v. Causby*, 328 U.S. 256 (1946), the Supreme Court recognizes "regulatory" takings as well.  *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495 (1987).  In other words, a taking under the Fifth Amendment includes government actions that (1) cause a property owner to suffer a physical invasion of his property, and (2) goes too far in regulating property.  *Sheffield Dev. Co., Inc. v. City of Glenn Heights*, 140 S.W.3d 660, 670 (Tex. 2004).  "[W]hether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely upon the particular circumstances in that case."  *Id.* (internal citations omitted) (cleaned up).  However, there are two circumstances where regulatory action is compensable without case-specific inquiry: (1) a physical invasion; and (2) regulations

that deprive a property owner of all economically viable use of his or her property, even if the owner still physically possesses the property.  *See id.*  This second category—deprivation of all economically viable use—"is limited to the extraordinary circumstance when *no* product or economically beneficial use of the land is permitted."  *Id.* (emphasis in original).  Aside from these two categories, however, whether regulation has "gone too far" and constitutes a taking is a fact dependent analysis.[15]  *Id.* at 672.

Although each regulatory takings case turns on its own unique set of facts, there are certain guiding principles that a district court should follow.  In *Penn Central Transportation Co. v. City of New York*, the Supreme Court set out three factors that a court should consider when determining if the government committed a regulatory taking: (1) "the economic impact of the regulation on the claimant;" (2) "the extent to which the regulation has interfered with distinct investment-backed expectations;" and (3) "the character of the governmental action."  438 U.S. 104, 124 (1978).

TXI alleges that the City committed a regulatory taking when it rezoned and amortized TXI's property.  The City argues that there was no regulatory taking because the change in zoning and amortization merely restricts TXI's use of the property and, while there might be some economic harm to TXI, the value of the property is not severely affected and there is no interference with distinct investment backed expectations.  TXI counterargues that the regulatory takings claim is riddled with fact disputes which preclude summary judgment on this issue.  The Court agrees with TXI.

---

[15] TXI asserts that there may also be a regulatory taking under the substantially advances test.  That is, TXI claims that there is a regulatory taking when regulations fail to substantially advance a legitimate government interest (Dkt. #86 at pp. 29–30).  However, that test is no longer applicable to Fifth Amendment takings claims.  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 545 (2005).  The Supreme Court noted in *Lingle* that *Agins v. City of Tiburon*, 447 U.S. 255, which promulgated the "substantially advances" takings test was based on due process precedent, not takings precedent.  *Id.*  Accordingly, the Supreme Court overruled *Agins*, holding that "the 'substantially advances' formula announced in *Agins* is not a valid method of identifying regulatory takings for which the Fifth Amendment requires just compensation."  *Id.*

For example, there are fact questions relating to the economic impact on TXI from the loss of its concrete batch plant.  To be sure, the City can hardly argue that there is definitively no economic impact when the reality is that TXI will be forced to shut down a multi-million-dollar business.  The breadth of TXI's operation also leads to a fact question concerning the amortization, the evidence relied on by the City to reach its amortization decision, and the timeline set for the amortization.  Likewise, the City can hardly contend that there is not a question of whether the amortization and rezoning interfered with TXI's investment-backed expectations when the City knew TXI had plans for expansion, or at the very least to continue profitably operating.

There are genuine issues of fact; accordingly, summary judgment on the issue of regulatory taking is inappropriate.

### g.  Chapter 245 of the Texas Local Government Code

Chapter 245 of the Texas Local Government code is a vested rights statute.  It "creates a system by which property developers can rely on a municipality's land-use regulations in effect at the time the original application for a permit had been filed."  *City of Houston v. Commons at Lake Houston*, Ltd., 587 S.W.3d 494, 499 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Section 245.002(a) provides that:

> [e]ach regulatory agency shall consider the approval, disapproval, or conditional approval of an application for a permit solely on the basis of any orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect at the time:
>
> (1) the original application for the permit is filed for review for any purpose, including review for administrative completeness; or
>
> (2) a plan for development of real property or plat application is filed with a regulatory agency.

61

Tᴇx. Lᴏᴄ. Gᴏᴠ'ᴛ Cᴏᴅᴇ § 245.002(a).  Under § 245.002, "once the first application for a permit required for a property-development project is filed with a regulatory agency, the agency's regulations are 'effectively 'frozen' in their then-current state." *Town Park Ctr., LLC v. City of Sealy*, 639 S.W.3d 170, 190 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (internal citations omitted).  Essentially, this means that "the agency is prohibited from subsequent regulatory changes to further restrict the property's use" because the property owner's rights in the project are vested.  *Id.*  It is important to note, however, that the rights are not in the property itself.  *Id.* Rather, "the rights vest in the particular project."  *Id.*

The City argues that it has not violated Chapter 245 of the Texas Local Government Code because TXI's concrete batch plant is not an ongoing project as defined by Chapter 245.[16] TXI counterargues that the protections afforded by Chapter 245 are not lost once a business is constructed and a certificate of occupancy is issued.  According to TXI, if the Court were to find otherwise, it would frustrate the statutory intent behind Chapter 245.  TXI also points to a state court's decision regarding whether CowTown was protected under Chapter 245.

Here, TXI's concrete batch plant is an ongoing business, and an ongoing business is not protected under Chapter 245.  Under § 245.002(a), a project is "an endeavor over which a regulatory agency exerts its jurisdiction and for which one or more permits are required to initiate, continue, or complete the endeavor."  Tᴇx. Lᴏᴄ. Gᴏᴠ'ᴛ Cᴏᴅᴇ § 245.002(a).  "The

---

[16] TXI also makes the argument that, even if Chapter 245 does not apply to an ongoing business, it is still under the protection of Chapter 245 because its site is not fully developed according to the original site plan.  Indeed, according to TXI the original site plan, which was created two decades before the filing of this lawsuit, foresaw an asphalt plant being constructed on TXI's property.  However, no asphalt plant has been built yet.  TXI points to the Settlement Agreement and the approved site plan attached to the Settlement Agreement as "Exhibit A" to show that an asphalt plant was to be constructed on the property currently owned and occupied by TXI.  However, the site plan from the Settlement Agreement is two decades old.  Moreover, TXI provides no evidence that it is currently constructing an asphalt plant.  Nor does TXI provide any indication that there are still plans to construct an asphalt plant.  However, mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice as affirmative evidence that will defeat the City's properly supported motion for summary judgment.  *Anderson*, 477 U.S. at 257.  Indeed, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment.  *In re Mun*, 672 F.2d at 440.

operation of an ongoing business is not a 'project' within the meaning of Chapter 245." *City of*

*Dickinson v. Stefan*, 611 S.W.3d 654, 661 (Tex. App.—Houston [14th Dist.] 2020, no pet.)

(citing *Anderton v. City of Cedar Hill*, 447 S.W.3d 84, 95–96 (Tex. App.—Dallas 2014, pet.

denied)).  Thus, as far as TXI's ongoing business argument is concerned, Chapter 245 does not

apply.

TXI also attempts to point to the state court's holding concerning CowTown's protections

under Chapter 245 are unpersuasive.  First, TXI provides no facts which would show that the

facts surrounding CowTown's use of its property are the same as TXI's use of its property.  The

Court is unaware as to whether CowTown currently has ongoing construction or projects beyond

its ongoing business that were under way when the ordinances are issue were put in place.

Second, as far as the facts of this case are concerned, TXI has not given the Court sufficient

reasoning for why the Court should stray from well-established authority on the scope of Chapter

245.  In other words, TXI did not make any showing that this case is distinguished from other

cases that deal with the issue of what Chapter 245 protects.

The City has proven that Chapter 245 does not apply in this case.  Thus, summary

judgment on TXI's Chapter 245 theory is granted in favor of the City and the claim is dismissed.

### h. TXI Did Not Respond to the City's Argument that § 146-134(1)(6) is Unconstitutional

In TXI's complaint, it seeks a declaratory judgment that § 146-134(1)(6) is

unconstitutional.  TXI does not provide any facts or arguments in support of this contention.  The

City addressed this issue in its motion, arguing that TXI provides no explanation at all as to how

§ 146-134(1)(6) is unconstitutional.   Additionally, the City argues that TXI lacks standing

because the ordinance was never applied to TXI.  Despite the City's motion arguing the Court

should dispose of this issue on summary judgment, TXI did not address the argument whatsoever

its response to the City's motion.  Therefore, the City argues that it is entitled to summary judgment on this claim for the reasons stated in its motion.  The Court agrees.  When a party fails to properly address another party's assertion, the Court may grant summary judgment if the motion and supporting materials show that the movant is entitled to summary judgment.  FED. R. CIV. P. 56(e)(3).  That is, a court may not "enter a 'default' summary judgment" on a claim; however, a court is permitted to accept the movant's evidence as undisputed and grant summary judgment if the facts and arguments support disposing of the claim on summary judgment.  *See Graham v. Dall. Area Rapid Transit*, 288 F. Supp. 3d 711, 727 (N.D. Tex. 2017).

First, the City argues in its motion that this case is nonjusticiable because TXI lacks standing. Thus, the Court must answer the threshold question of whether TXI "presents an 'actual controversy,' a requirement imposed by Art. III of the Constitution and the express terms of the Federal Declaratory Judgment Act, 28 U.S.C. § 2201." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 541 (5th Cir. 2008) (quoting *Steffel v. Thompson*, 415 U.S. 452, 458 (1974)).  The doctrines that have fleshed out the "actual controversy" requirement are "founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Id.* at 542 (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975))).  These "doctrines state fundamental limits on federal judicial power in our system of government." *Id.* (citing *Allen*, 468 U.S. at 750).

Essentially, standing requires courts to ask, "whether the litigant is entitled to have the [C]ourt decide the merits of the dispute or of particular issues." *Id.* (quoting *Warth*, 422 U.S. at 498).  A plaintiff can show he or she has standing by alleging "personal injury fairly traceable to the defendant's allegedly unlawful conduct and like to be redressed by the requested relief." *Id.* A plaintiff must establish "(1) it has suffered, or imminently will suffer, a concrete and

64

particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." *Id.* (quoting *Houston Chron. Publ'g Co. v. City of League City*, 488 F.3d 613, 617 (5th Cir. 2007)).

Here, TXI does not indicate if it is alleging the ordinance is unconstitutional under the United States Constitution, Texas Constitution, or both.  More importantly, the City did not cite TXI for violating § 146-134(1)(6).  Nor is there any indication that TXI is in immediate danger of the City citing it for violating § 146-134(1)(6) in the future.  "The injury-in-fact element requires that a plaintiff show that he or she 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural or hypothetical.'" *Id.* (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)) (cleaned up).  TXI has not shown that it suffered any injury thus far and TXI has not shown that it is in danger of imminently suffering a concrete and particularized injury-in-fact.  Any injury-in-fact to TXI is conjectural or hypothetical.  Accordingly, TXI has not suffered an injury-in-fact and does not have standing.

Furthermore, the Court concludes that TXI waived or abandoned his claim that § 146-134(1)(6) is unconstitutional.  To be sure, "[w]hen a party fails to pursue a claim or defense beyond the party's initial complaint, the claim is deemed abandoned or waived. *Graham*, 288 F. Supp. 3d at 727 (citing *Black v. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (plaintiff abandoned claim when she failed to defend claim in response to motion to dismiss); *Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002) (noting that "an issue raised in the complaint but ignored at summary judgment may be deemed waived . . . .")).  TXI failed to

pursue its unconstitutional claim therefore it is no longer before the Court, and TXI has abandoned or waived that claim.  *See id.*

### i.   TXI Did Not Respond to the City's Argument that the City's Noise Ordinance is Not Preempted by the Texas Constitution

In TXI's complaint, it alleges that the City's noise ordinances are preempted by the Texas Constitution and are therefore null and void.  The City addressed this point in its motion, arguing that TXI provides no explanation at all as to how the City's noise ordinances are preempted by the Texas Constitution.  Indeed, TXI does not point to any specific part of the Texas Constitution that would cause any of the noise ordinances to be preempted.  Moreover, the City argues that TXI would be unable to prove that the noise ordinances are preempted because they are not in fact preempted.  Accordingly, the City requests that the Court dispose of the claim on summary judgment.  The Court agrees that dismissal is proper.  As discussed, when a party fails to properly address another party's assertion, the Court may grant summary judgment if the motion and supporting materials show that the movant is entitled to summary judgment.  FED. R. CIV. P. 56(e)(3); *see also Graham*, 288 F. Supp. 3d at 727.

Here, as the City points out, TXI's complaint does not identify a relevant part of the Texas Constitution to consider.  Nor does TXI's complaint provide any factual allegations or caselaw demonstrating applicability of any constitutional provision in support of preemption. The Court is not of any portion of the Texas Constitution that would preempt a city-wide noise ordinance.  Regardless, TXI's failure to advocate on behalf of its claim that the Texas Constitution preempts the City's noise ordinance results in a waiver.

Indeed, the Court concludes that TXI waived or abandoned his claim that the Texas Constitution preempts the City's noise ordinances for the same reason the Court concluded TXI waived its claim that § 146-134(1)(6) is unconstitutional.  To be sure, "[w]hen a party fails to

pursue a claim or defense beyond the party's initial complaint, the claim is deemed abandoned or waived. *Graham*, 288 F. Supp. 3d at 727; *Black*, 461 F.3d at 588 n.1; *Keenan*, 290 F.3d at 262. TXI failed to pursue its preemption claim therefore it is no longer before the Court, and TXI has abandoned or waived that claim. *See id.*

### j.   TXI Did Not Respond to the City's Argument that There is No Controversy as to the Site Plan

In TXI's complaint, TXI alleges its property complies with the site plan from the Agreed Judgment and Settlement Agreement.  TXI asks the Court to grant declaratory judgment stating the same.  In the City's motion for summary judgment, the City argues that the Court should dispose of this claim because there is no controversy as to whether TXI's use of its property complies with the approved site plan or Agreed Judgment.  TXI, though, did not respond to this argument.  Rather, TXI argued that declaratory relief was appropriate as to the notice issue, failing to address the City's argument entirely.  The Court agrees with the City that no actual controversy exists.   Additionally, TXI failed to address this argument in its response and therefore it did not meet its summary judgment burden.

A declaratory judgment action is ripe for adjudication only where an "actual controversy" exists.  *See* 28 U.S.C. § 2201(a) ("In a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the right and other legal relations of any interested party seeking such declaration.") (emphasis added); *Texas v. West Publ'g. Co.*, 882 F.2d 171, 175 (5th Cir. 1989).   As a general rule, an actual controversy exists where "a substantial controversy of sufficient immediacy and reality [exists] between parties having adverse legal interests." *Middle South Energy, Inc. v. City of New Orleans*, 800 F.2d 488, 490 (5th Cir. 1986); *see generally West Publ'g. Co.*, 882 F.2d at 175 (noting that the "case or controversy" requirement of Article III of the United States Constitution is "identical to the actual controversy

requirement under the Declaratory Judgment Act.").  Whether particular facts are sufficiently immediate to establish an actual controversy is a question that must be addressed on a case-by-case basis.  *See Mobil Oil Corp. v. Oil, Chem. & Atomic Workers Int'l Union*, 483 F.2d 603 (5th Cir. 1973).

Here, no actual controversy exists.  Any dispute related to whether TXI's property complies with the site plan from the Agreed Judgment and Settlement Agreement was settled prior to the start of this lawsuit.  To be sure, neither party disputes that TXI's property complies with the site plan from the Agreed Judgment and Settlement Agreement.  Furthermore, as with the other claims TXI failed to pursue in response to the City's motion for summary judgment, the Court concludes that TXI waived or abandoned his claim that § 146-134(1)(6) is unconstitutional.  *Graham*, 288 F. Supp. 3d at 727.

## CONCLUSION

It is therefore **ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Dkt. #59) is hereby **DENIED**, City Defendant's Amended Motion for Summary Judgment (Dkt. #65) is hereby **GRANTED in part** and **DENIED in part**, Plaintiff's Resubmission of its Objections to Defendants' Summary Judgment Evidence and Motion to Strike (Dkt. #88) is hereby **DENIED**, and City Defendants' Objections to Plaintiff's Summary Judgment Evidence and Motion to Strike (Dkt. # 74) is hereby **GRANTED in part** and **DENIED in part**.

It is therefore further **ORDERED** that the following claims which the City asked the Court to dispose of on summary judgment are hereby dismissed:

1. TXI's claim that the City breached the Settlement Agreement or violated the Agreed Judgment;

2. TXI's claim that the City violated TXI's rights under the Equal Protection Clause;

3. TXI's claim that McKinney Texas Code of Ordinances § 70-120(b)(7) is unconstitutionally vague;

4.  TXI's claim that McKinney Texas Code of Ordinances § 146-40(g)(3)(d) is unconstitutional;

5.  TXI's claim that the City's actions violated Chapter 245 of the Texas Local Government Code;

6.  TXI's claim that the Texas Constitution preempts the City's noise ordinances; and

7.  TXI's claim that it did not violate the site plan put forth in the Agreed Judgment and Settlement Agreement.

Whether the City violated TXI's substantive or procedural due process rights are the only issues remaining for the jury.  Lastly, the Court must still determine whether the City's rezoning and amortization ordinances are unconstitutionally retroactive and whether the City's actions amount to a regulatory taking of TXI's property.

**IT IS SO ORDERED**.

**SIGNED this 11th day of January, 2023.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE